*In re* 1987-88 MEDICAL DOCTOR PROVIDER CLASS PLAN

Docket Nos. 144058, 146046. Submitted April 22, 1993, at Detroit. Decided February 22, 1994, at 9:35 A.M. Leave to appeal sought.

In May 1987, Blue Cross and Blue Shield of Michigan filed with the Insurance Commissioner its 1987-88 medical doctor provider class plan pursuant to the provisions of the Nonprofit Health Care Corporation Reform Act, MCL 550.1101 *et seq.*; MSA 24.660(101) *et seq.* The commissioner did not disapprove the plan, and the plan went into effect. In February 1990, the commissioner notified BCBSM that he was undertaking review of the plan as was permitted under the act. Following a public hearing, and despite recommendations by Insurance Bureau staff members that the plan did not achieve any of the three statutory goals required under MCL 550.1504(1); MSA 24.660(504)(1), the commissioner issued a determination report that found that BCBSM had satisfied the access and quality goals and had failed reasonably the cost goal, and, accordingly, the plan was found to be satisfactory under MCL 550.1510(1); MSA 24.660(510)(1). Two groups, each composed of both physicians and subscribers, appealed the commissioner's determination pursuant to MCL 550.1515; MSA 24.660(515). BCBSM intervened in the appeal. The appeal was heard by an independent hearing officer selected pursuant to the provisions of MCL 550.514; MSA 24.660(514). Following extensive hearings and the admission of numerous exhibits, the hearing officer issued a decision and order reversing the determination of the commissioner and finding that BCBSM had failed unreasonably to achieve all three of the statutory goals. BCBSM appealed that order by leave granted. The hearing officer thereafter entered an order requiring BCBSM to submit a remedial plan to him for his determination of its adequacy in achieving the statutory goals and entered a separate order granting costs and attorney fees, to be paid by BCBSM, to the parties who had appealed the commis-

REFERENCES

Am Jur 2d, Administrative Law § 397 *et seq.*, 522, 546.

See ALR Index under Hearings; Insurance and Insurance Companies.

sioner's determination. BCBSM appealed those orders by leave granted. The appeals were consolidated.

The Court of Appeals *held:*

1. The appeal procedure envisioned by the Legislature to be conducted by an independent hearing officer involves a review of the Insurance Commissioner's determination whether BCBSM achieved the statutory goals. Although the hearing officer may undertake further fact finding and hold evidentiary hearings at which the party appealing the commissioner's determination bears the burden of proof, the proceeding is not a review de novo of the merits of the plan submitted by BCBSM, but rather is a review of the commissioner's determination, and that determination should not be disturbed unless so clearly wrong as to be the equivalent of a confiscatory or oppressive rate in a utility rate case.

2. The Insurance Commissioner's determination concerning whether the submitted plan achieved the statutory goals was supported by facts on the record and was based on proper standards and, accordingly, constituted a proper exercise of his statutorily mandated authority. Therefore, the commissioner's determination should not have been disturbed and should have been affirmed by the independent hearing officer.

3. In an appeal of the Insurance Commissioner's determination pursuant to § 510(1), an independent hearing officer may only affirm or reverse the commissioner's determination. Jurisdiction to consider any remedial plan or to decide whether to grant an extension of time in which to file a remedial plan lies with the Insurance Commissioner rather than with the independent hearing officer.

4. There is no authority for the awarding of costs or attorney fees by an independent hearing officer in an appeal of the Insurance Commissioner's determination under § 510(1). Accordingly, the award of costs and attorney fees by the hearing officer in this case was improper and must be set aside.

5. Any findings of fact by an independent hearing officer must be concise, and such findings must be made before the hearing officer can order the preparation of a remedial plan.

Final decision and order of the independent hearing officer reversed; determination of the Insurance Commissioner that the 1987-88 medical doctor provider plan achieved the statutory goals reinstated.

WHITE, J., concurring in part and dissenting in part, agreed that an independent hearing officer is limited to either affirming or reversing the determination of the Insurance Commissioner, that the hearing officer exceeded his authority by re-

quiring that the remedial plan be submitted to him, and that the hearing officer lacked the authority to award attorney fees, but stated that an independent hearing officer's review is conducted under Chapter 4 of the Administrative Procedures Act, MCL 24.271-24.287; MSA 3.560(171)-3.560(187), and is broader than the review available in utility rate cases and that this hearing officer, on the record before him, properly determined that the 1987-88 medical doctor provider class plan did not satisfy the statutory goals and properly ordered BCBSM to submit a remedial plan. The remedial plan then should be considered by the Insurance Commissioner, with any appeal of the commissioner's new determination to be heard by a newly selected independent hearing officer.

1. INSURANCE — NONPROFIT HEALTH CARE CORPORATIONS — PROVIDER CLASS PLANS — APPEAL.

A determination of the Insurance Commissioner with respect to a provider class plan under the Nonprofit Health Care Corporation Reform Act should not be disturbed on appeal to an independent hearing officer unless so clearly wrong as to be the equivalent of a confiscatory or oppressive rate in a utility rate case (MCL 550.1510[1], 550.1515; MSA 24.660[510][1], 24.660[515]).

2. INSURANCE — NONPROFIT HEALTH CARE CORPORATIONS — PROVIDER CLASS PLANS — APPEAL.

An independent hearing officer in an appeal of the Insurance Commissioner's determination with respect to a provider class plan under § 510 of the Nonprofit Health Care Corporation Reform Act may only affirm or reverse the commissioner's determination; jurisdiction to consider any remedial plan lies with the Insurance Commissioner rather than the independent hearing officer (MCL 550.1510[1], 550.1515[3][a]; MSA 24.660[510][1], 24.660[515][3][a]).

3. INSURANCE — NONPROFIT HEALTH CARE CORPORATIONS — PROVIDER CLASS PLANS — APPEAL — ATTORNEY FEES.

An independent hearing officer has no authority to award costs or attorney fees in an appeal of the Insurance Commissioner's determination with respect to a provider class plan under the Nonprofit Health Care Corporation Reform Act (MCL 550.1510[1], 550.1515; MSA 24.660[510][1], 24.660[515]).

*Frimet & Michalsen, P.C.* (by *Gilbert M. Frimet, John A. Michalsen,* and *Alan T. Rogalski*), for Mary Gail McPhee and others.

*Wachler & Kopson, P.C.* (by *Herbert A. Jordan, Andrew B. Wachler,* and *Phyllis A. Avery*), for Carolyn Buckner and others.

*Daniel W. McKelvey* and *Edward W. Fisher* (*O'Leary, O'Leary, Jacobs, Mattson & Perry, P.C.,* by *John P. Jacobs,* of Counsel), for Blue Cross and Blue Shield of Michigan.

Amicus Curiae:

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Raymond O. Howd,* Assistant Attorney General, for the Insurance Commissioner.

Before: HOLBROOK, JR., P.J., and SAWYER and WHITE, JJ.

HOLBROOK, JR., P.J. These appeals are from the August 5, 1991, decision and several subsequent ancillary orders of Independent Hearing Officer (IHO) Robert Borsos issued under part 5 of the Nonprofit Health Care Corporation Reform Act, 1980 PA 350, MCL 550.1101 *et seq.*; MSA 24.660(101) *et seq.*, effective April 3, 1981. The IHO reversed the August 16, 1990, determination of the Insurance Commissioner (IC), MCL 550.1510; MSA 24.660(510), and ordered appellant Blue Cross and Blue Shield of Michigan (BCBSM) to transmit to the IHO a remedial plan for determination by the IHO whether the remedial plan should be retained. The plan involved is the 1987-88 medical doctor provider class plan, which affects over ten thousand doctors and several million BCBSM subscribers.

This case represents the first time an IHO has been used for an appeal under part 5 of the act. In *Blue Cross & Blue Shield of Michigan v Governor,* 422 Mich 1; 367 NW2d 1 (1985), the Court rejected

BCBSM's argument that IHOS unconstitutionally were delegated authority and were wholly unaccountable. *Id.* at 55-59. The Court declined to rule on BCBSM's claim that the statutory "goals" of reasonable access, quality, and cost of medical care were unconstitutionally vague and illusory. *Id.* at 92-93. This appeal presents numerous issues concerning the nature of the "appeal" before an IHO and the extent of an IHO's authority.

### THE NONPROFIT HEALTH CARE CORPORATION REFORM ACT

The historical background of the act is described in *BCBSM v Governor. Id.* at 13-18. The act was designed to broaden the IC's power to regulate BCBSM's rates. *Id.* at 17-18, 49. The "primary objective" of the act is "to check rising health care costs." *Id.* at 18. The act is "aimed at curbing the rise in health care costs by a unique statutory scheme which combines both free-market and government regulatory methods of control." *Id.*

The act itself states its purpose and intent is "to promote an appropriate distribution of health care services for all residents of this state" and "to assure . . . reasonable access to, and reasonable cost and quality of, health care services," among other things. MCL 550.1102(1); MSA 24.660(102)(1). The Legislature vested the IC with the primary authority to regulate BCBSM and to see that the act's requirements were satisfied. MCL 550.1102(2), 550.1601; MSA 24.660(102)(2), 24.660(601).

### PROVIDER CLASS PLANS

The act requires BCBSM to file "provider class plans" with the IC. MCL 550.1506(1); MSA 24.600(506)(1). A provider class is a class of care

providers, such as medical doctors. Section 107(6), MCL 550.1107(6); MSA 24.660(107)(6). A "provider class plan" is a document containing the reimbursement arrangement pertaining to the class of providers, "objectives" for the provider class, and the contract provisions BCBSM has with the providers. Section 107(7).

The act directs BCBSM to enter into contracts with providers that assure subscribers reasonable access, reasonable costs, and reasonable quality of health care in accordance with described goals. MCL 550.1504(1); MSA 24.660(504)(1) states:

> A health care corporation shall, with respect to providers, contract with or enter into a reimbursement arrangement to assure subscribers reasonable access to, and reasonable cost and quality of, health care services, in accordance with the following goals:
>
> (a) There will be an appropriate number of providers throughout this state to assure the availability of certificate-covered health care services to each subscriber.
>
> (b) Providers will meet and abide by reasonable standards of health care quality.
>
> (c) Providers will be subject to reimbursement arrangements that will assure a rate of change in the total corporation payment per member to each provider class that is not higher than the compound rate of inflation and real economic growth.

The act's preamble and § 102(3) express the Legislature's desire for an expeditious and effective procedure for administrative appeals relative to provider class plans. Regarding administrative review of provider class plans, the act is to be construed "to minimize uncertainty and delays."

### REVIEW OF PROVIDER CLASS PLANS

When BCBSM initially transmits a plan to the IC,

the IC is to examine the plan and determine "only" if the plan contains a reimbursement arrangement and "objectives [defined in § 106(5), MCL 550.1106(5); MSA 24.660(106)(5)] for each goal" provided in § 504. Section 506(2). If the IC does not disapprove or does not act within fifteen days, the plan automatically goes into effect and is "retained." Section 506(4).

A provider class plan retained under § 506(4) may be more thoroughly reviewed after two years. Section 509(1)(b), MCL 550.1509(1)(b); MSA 24.660(509)(1)(b). The IC must determine whether the health care corporation "has substantially achieved the goals of a corporation as provided in section 504 and achieved the objectives contained in the provider class plan." Section 509(1). The IC has six months to make a determination. Section 509(2). The IC is required to consider the "overall balance" of the statutory goals as well as information gathered "for the record" that pertains to health and economic trends, changes in legislation, and comments from interested persons. Section 509(4). Such comments are encouraged, even during the review process, by § 505(2), MCL 550.1505(2); MSA 24.660(505)(2). A detailed statement in support of the IC's determination is required. Section 509(5). The determination process by the IC is *not* a contested case hearing under Chapter 4 of the Administrative Procedures Act, MCL 24.271-24.287; MSA 3.560(171)-3.560(187).

Under MCL 550.1510(1)(a)-(1)(c); MSA 24.660(510)(1)(a)-(1)(c) the IC must make one of three determinations: (1) the plan achieves the corporation's § 504 goals; (2) the plan fails to substantially achieve one or more of the goals but, based on competent, material, and substantial information, the failure is reasonable, in which case the plan need not be changed; or (3) the plan fails

to substantially achieve one or more of the statutory goals. If an unreasonable failure is found, the IC must prepare a "concise written statement of specific findings." Section 510(2). If the plan is found satisfactory under § 510, the review process does not continue. But an appeal to an IHO is available. Section 515(1), MCL 550.1515(1); MSA 24.660(515)(1). The instant case is such an appeal.

If the plan is found inadequate by the IC, then the health care corporation must transmit a remedial plan within six months that "substantially achieves the goals, achieves the objectives, and substantially overcomes the deficiencies enumerated in the findings made by the commissioner" under § 510(2). Section 511(1), MCL 550.1511(1); MSA 24.660(511)(1). If the health care corporation does not act in six months, the IC is required to prepare a plan. Section 511(2).

Once a health care corporation submits a remedial plan under § 511, the IC has ninety days to determine whether the plan substantially achieves the goals, achieves the objectives, and substantially overcomes the deficiencies previously enumerated by the IC. Section 513(1), MCL 550.1513(1); MSA 24.660(513)(1). If the remedial plan is satisfactory, it is retained, and the process ends, except that an appeal to an IHO is available under § 515(1). If the remedial plan is not satisfactory, the IC is required to prepare a satisfactory plan. Section 513(2)(a). An appeal to an IHO is available from a plan prepared by the IC. Section 515(1).

APPEALS TO AN INDEPENDENT HEARING OFFICER

The act provides for appeals from "any action or determination" of the IC under four specific sections of the act, §§ 509(1), 510(1), 513(1), and 513(2). Section 515(1). Standing to appeal is given to

subscribers, the attorney general, organizations representing affected providers, and others. *Id.* An appeal must identify the issues involved. *Id.*

Appeals are decided by an "independent hearing officer." The qualifications of an IHO are set forth in § 514, MCL 550.1514; MSA 24.660(514), and include being a retired circuit court judge and not being involved in the provision of health care services. An IHO is selected at random by the IC from a list compiled by the State Court Administrator, and an IHO is selected "on a per appeal basis." Section 514(2).

The act provides for a thirty-day time limit in which to bring an "appeal" to an IHO and to commence "appeal hearings." Section 515(2). No specific standard of review for the IHO is mentioned in the act. However, appeals before an IHO are conducted pursuant to Chapter 4 of the Administrative Procedures Act, which governs contested case proceedings, MCL 24.271-24.287; MSA 3.560(171)-3.560(187). Section 515(2).

The relief available from an IHO is set forth and "limited" in some detail in subsections 3 through 5 of § 515. First, the relief available is limited to "affirming or reversing the determination of the commissioner under sections 509(1) and 510(1)." Section 515(3)(a). Second, the IHO may approve submitted remedial plans or a plan prepared by the IC under § 513(2)(a). Sections 515(3)(b)(i) and 515(3)(b)(ii). Third, if the IHO finds that a plan described in subsection 3(b)(i) or 3(b)(ii) is not adequate, the plan shall not be retained, and the health care corporation must submit to the IHO within 180 days a plan that conforms to the IHO's findings and that "substantially achieves the goals . . . in section 504." Sections 515(3)(b)(iii) and 515(4). The IHO must then approve the plan or determine that it should not be retained. Section

515(5). If the iho determines that the plan should not be retained, *the ic* "may" suspend or limit the corporation's certificate of authority until the corporation submits a plan that the iho determines should be retained. Section 515(5)(b). The act does not give the iho any authority to prepare a plan (as the ic is authorized to do in § 513[2][a]), to sanction a corporation, or to order the ic to sanction a corporation.

### APPEALS FROM AN INDEPENDENT HEARING OFFICER

Appeals to the courts are provided in MCL 550.1518; MSA 24.660(518). Appeals from "final determinations" of an iho may be taken to this Court within thirty days. Such appeals are pursuant to Chapter 6 of the Administrative Procedures Act, MCL 24.201-24.206; MSA 3.560(201)-3.560(206). A decision may be set aside under MCL 24.306; MSA 3.560(206) if the decision is in excess of authority or is not supported by competent, material, and substantial evidence. As stated in *Amalgamated Transit Union, Local 1564 v SEMTA*, 437 Mich 441, 450; 473 NW2d 249 (1991), legal rulings of an administrative agency may be set aside if they violate the constitution or a statute or are affected by a substantial and material error of law.

### CASE CHRONOLOGY

Bcbsm filed its 1987-88 medical doctor provider class plan in May 1987. The plan was retained pursuant to § 506(4). Before submitting its plan, bcbsm consulted with the Insurance Bureau staff to develop "standards" against which to measure bcbsm's achievement of the statutory goals set forth in § 504.

On February 1, 1990, the IC notified BCBSM that he was undertaking a review of the plan. The IC thus had until August 1, 1990, to reach a determination. Section 509(2). A public hearing was held on March 27, 1990.

Susan Scarane, an Insurance Bureau staff member, was assigned to draft the determination report for the IC. Scarane was contacted on several occasions by attorneys for those who are the appellees in this appeal. For the most part, Scarane rejected the standards used by BCBSM to justify its plan. Scarane substituted standards that she believed were more appropriate. Scarane found that BCBSM failed these standards, and, thus, Scarane's draft found that BCBSM failed to achieve substantially all three statutory goals and concluded that the plan was governed by § 510(1)(c), which would necessitate the submission of a remedial plan under § 511(1). Scarane's draft was prepared by the end of May 1990.

Insurance Bureau staff meetings followed. Other staff members initially agreed with Scarane, but by August at least some had changed their minds. There were also several meetings between the IC and various BCBSM officials. By July 20, the IC indicated he would sign a determination report that found reasonable failures under § 510(1)(b). The draft determination report was so revised.

The IC reviewed the revised draft and discussed it with BCBSM officials. On August 13, the IC determined that BCBSM had satisfied the access and quality goals and had failed reasonably the cost goal. A report consistent with this determination was issued on August 16, 1990.

On September 14, appeals were filed by two groups, largely comprised of physicians. Those groups are the appellees in this Court, and will

hereafter be referred to as the appellees. BCBSM did not file an appeal.

IHO Borsos was selected, and he arranged a hearing on October 12, 1990. BCBSM moved to intervene. On October 26, the IHO, upon the IC's request, issued a protective order preventing the IC from being called as a witness or from being deposed. On December 6, BCBSM's motion to intervene was formally granted.

On December 13, 1990, a hearing was held, at which the IHO ruled that the appeal was a "square one" proceeding "de novo" and that the burden was on BCBSM to prove that it satisfied the statutory goals. The IHO also ruled that BCBSM could not appeal the ruling that it had failed reasonably the cost goal, because BCBSM had not appealed within thirty days. These rulings were explained in an opinion and order on January 11, 1991.

The IHO heard about fourteen weeks of trial testimony, generating about fifty-five transcripts and almost two hundred exhibits. Scarane was a major witness.

On August 5, 1991, the IHO issued his twenty-nine-page decision reversing the determination of the IC. The IHO found that BCBSM unreasonably failed all three statutory goals.

At a hearing on August 12, 1991, the IHO ruled that attorney fees were available to the prevailing parties and that BCBSM was to submit a remedial plan to the IHO for review.

On September 3, 1991, this Court granted BCBSM's application to appeal the August 5 decision. Docket No. 144058.

A dispute developed between the IC and the IHO regarding the IHO's continuing responsibilities and authority, payment for the IHO, and the IHO's continued use of insurance bureau facilities.

After a hearing on October 3, 1991, the IHO entered (1) a "Determination" order, which codified his August 5 decision and required the IHO to determine if the remedial plan was adequate and to rule on any request for a ninety-day extension for filing by BCBSM, (2) an order denying a BCBSM motion to disqualify the IHO on the basis of the dispute between the IC and the IHO, and (3) an order permitting attorney fees and costs.

On October 18, the IHO signed orders (dated October 3) that awarded roughly $520,000 in attorney fees and $29,000 in costs to the attorneys representing the two appealing groups.

On October 31, this Court granted BCBSM's application to appeal the orders of October 3 and October 18. Docket No. 146046.

### THE INSURANCE COMMISSIONER'S DETERMINATION REPORT

Most of the fifty-two-page determination report is devoted to a discussion of the three statutory goals and the IC's conclusion concerning whether those goals were achieved.

The commissioner concluded the access goal was satisfied for 1987 and 1988 on the basis of BCBSM's achievement of an "overall service benefit level participation rate" of ninety percent, an overall "formal participation rate" of 68.3 percent, and a "formal participation rate in every region of the lesser of 50% or twice the BCBSM membership proportion of the population." The IC also discussed matters that might be given more weight in the future reviews and the possibility of assessing access on the basis of medical specialties and geographical areas.

BCBSM used a "full service benefit level" of seventy-nine percent as the standard for the rea-

sonable access goal. The state was divided into nine regions and the standard was applied to each region. "Service benefit level rate" refers to the percentage of total services for which providers accepted BCBSM reimbursement as payment in full. On a "statewide" basis, the rate was ninety percent. Regionally, two regions had rates in the sixty percent range, one region was at seventy-nine percent, three regions were in the eighty percent range, and three regions were above ninety percent. The report prepared by Scarane criticized this standard because it was more representative of "financial access" than "physical access."

Scarane proposed a standard that would measure the "formal participation" of physicians by specialty and by region. The proposed alternative standard for the access goal was a participation rate by medical doctors in each region of at least twice the proportion of the region's population that were BCBSM members but in no event less than fifty percent of the medical doctors in each region. Under these standards in 1988, "formal participation rates" varied from two regions that were in the forty percent range to four regions that were in the seventy percent range, for a "statewide" average of sixty-eight percent. The medical doctor participation rate, by region, was at least twice the rate of the population's membership in BCBSM in seven of nine regions.

Relative to the quality goal, the IC determined that the goal was satisfied for 1987 and 1988 if the evaluation utilized BCBSM's "standard" that physicians should have appropriate licenses and should be subject to utilization review programs. The bulk of the lengthy discussion in the determination report regarding quality of care pointed out weaknesses in BCBSM's business practices with providers and subscribers. The report recognized a need for

such things as standards for medical necessity determinations (something medical societies had not yet been able to develop) and practice guidelines. The report also recognized the need for BCBSM to review physician specialty certifications, to be more responsive in the area of "quality assurance and utilization review activities," and to provide a "fair and reasonable internal dispute resolution procedure."

The cost goal was quantified by a formula in § 504 that incorporates the compound rate of inflation and real economic growth. Under this formula, BCBSM was permitted to increase its payments by 6.3 percent. The determination report found that the increase (rate of change in total corporation payment per member to medical doctors) was 7.7 percent during the period being reviewed. Thus, BCBSM failed the statutory cost goal. But the IC concluded that the failure was reasonable because the information available was not complete, because it was possible that complete data would show achievement of the goal, and because the evidence showed that changes in utilization by specialty and region had a sizable impact on the cost increases.

On the basis of the IC's determination that the access and quality goals were satisfied and that the cost goal was failed reasonably, the provider class plan was retained, and the IC's review process came to an end.

### THE INDEPENDENT HEARING OFFICER'S DECISION

The IHO reversed the IC's determination and, further, entered a determination under § 510(1)(c). The IHO's decision incorporates by reference the arguments, briefs, and proposed findings of fact and conclusions of law submitted by both groups of

appellees. The proposed findings and conclusions of
attorney Andrew Wachler, representing one group
of appellees, is 153 pages in length, and the closing
brief of attorney Gilbert Frimet, representing the
other group of appellees, is sixty-nine pages in
length. To be found among these proposed findings
is the statement that an adequate plan should
"endeavor to reimburse physicians in Michigan
commensurate with the five surrounding states."
According to the proposed findings, Michigan phy-
sicians are paid, on average, forty percent less
than physicians in neighboring states.

The IHO concluded that the determination re-
port, on its face, showed that BCBSM failed all three
goals. The IHO rejected the standard of a full
service benefit level of seventy-nine percent as not
being a "valid objective." The IHO noted that the
objective was not reached in several regions. The
IHO emphasized that according to § 504(1)(a), the
access goal had to be judged on availability of
physicians "throughout" the state and not on a
"statewide" basis.

The IHO concluded that the licensing require-
ment and utilization review programs relied upon
by the IC were inadequate for satisfying the qual-
ity goal. The IHO noted numerous comments,
mostly by physicians, that BCBSM did not provide a
system for obtaining prompt and reasonable expla-
nations for problems that arose. The IHO noted
criticisms of BCBSM's internal provider-appeal pro-
cess, the lack of medical practice guidelines, con-
cerns about prompt and reasonable explanations
regarding reimbursement of physicians, and slow-
ness in recognizing new medical procedures. The
IHO found it "difficult to understand" why the IC
found the quality goal satisfied in light of "so
many reasons for failing BCBSM."

Concerning the cost goal, the IHO noted BCBSM's

evidence that the goal was failed by only one percent and the IC's finding that the goal was missed by 1.4 percent. The IHO found no basis for finding the failure of BCBSM to meet the cost goal to be reasonable.

The IHO concluded that, on the basis of the determination report itself, BCBSM had not carried its burden of proving that it had met any of the goals. The IHO concluded that in some instances binding arbitration should be used to resolve internal appeals. The IHO found that communication between physicians and BCBSM was such an important element of health care that it should be a standard in considering access and quality.

The IHO further concluded that the IC did not "act properly in rejecting the recommendations of his staff." On the basis of the numerous contacts between the IC and BCBSM officials and the IC's ultimate determination that contrasted sharply with his staff's recommendation, the IHO found that the IC did not act properly and that the IC "sold out" to BCBSM. The IHO further stated that the IC "should be able to give a believable reason" for overruling his staff and that the IHO could find no such reason.

The IHO also incorporated his prior rulings of January 11, 1991, concerning the nature of the proceeding before him and the burden of proof. The IHO concluded that the appeal before him was not a "judicial appeal," that he was not to ignore the evidence before the IC but would "not be bound by or required to give deference to the Commissioner's determination report," that he could provide "a procedure for a more careful scrutiny with better working tools" than the IC and his staff whose review was a "screening device," and that his review "goes back to 'square one', not blinded by what the Commissioner and his staff have

done." The IHO ruled that the "very nature" of the act placed the burden on appeal on BCBSM "to show by a preponderance of the evidence that it met the three statutory goals or, if it did not, that the failure in each case was reasonable."

### NATURE OF APPEAL TO THE INDEPENDENT HEARING OFFICE

The Legislature created an unusual appellate process. The IC's determination is based upon facts gathered during the review of a provider class plan, but specifically is not a contested case, § 509(8), while the appeal to the IHO is conducted pursuant to the Administrative Procedures Act's contested case procedures, § 515(2). Thus, on appeal the IHO does not review a formally established record but can create such a record.

BCBSM argues that the appeal to the IHO is to be based solely on the record developed before the IC, noting that § 509(4)(c) speaks of information obtained "for the record" by the IC. BCBSM also relies on *Walker v Wolverine Fabricating & Mfg Co, Inc,* 425 Mich 586; 391 NW2d 296 (1986), an appeal from a decision of the Civil Rights Commission in which our Supreme Court found that the appeal to circuit court was de novo, but based on the record developed before the commission.

BCBSM's view of the nature of the appeal process before the IHO cannot be correct. All words and phrases in a statute should be given their ordinary meaning in determining the Legislature's intent, *Lorencz v Ford Motor Co,* 439 Mich 370; 483 NW2d 844 (1992), and constructions leading to absurd results should be avoided, *Lepp v Cheboygan Area Schools,* 190 Mich App 726, 732; 476 NW2d 506 (1991). BCBSM's construction ignores or makes meaningless the provisions making appeals

subject to the contested case chapter of the Administrative Procedures Act and the Legislature's creation of an independent *hearing* officer with trial experience. It also leaves no opportunity to create an evidentiary record tested by cross-examination and protected by procedural and evidentiary safeguards.

*Walker* is distinguishable because it involved an express constitutional provision requiring appeals from the Civil Rights Commission to be "tried de novo before the circuit court." Const 1963, art 5, § 29. In such appeals, a formal record is first developed before the commission. Nevertheless, *Walker* demonstrates that "appeals" can take a variety of forms.

Appellees advance a construction of the appeal process that is at the other extreme from BCBSM's construction. The IHO essentially adopted appellees' view. Appellees are heavily influenced by the fact that the appellate officer is described as an "independent *hearing* officer," that an IHO must be a person experienced in conducting trials, that an appeal is to be conducted pursuant to the contested case procedures of the Administrative Procedures Act, and that there is no other opportunity to develop a record protected and tested by evidentiary and procedural safeguards. In a sense, appellees view the IHO as a special master having broad powers that include the power to find facts. Under this reasoning the appeal is a "square one" proceeding "de novo." It follows that there is no reason to give the IC's determination any weight and, therefore, there needs to be a showing, presumably by BCBSM, that its plan satisfies the statutory goals.

The position of appellees is as unacceptable as that of BCBSM. Appellees' construction eliminates any semblance of an "appeal." Yet the Legislature

repeatedly used the word "appeal" in §§ 514 and 515 and elsewhere in the act. "Appeals" are to be before an IHO, § 514(1), who is selected "per appeal," § 514(2), who conducts "appeal hearings," § 515(2), and who can provide relief "in an appeal," § 515(3).

Treating the appeal as a "square one" proceeding "de novo" was inconsistent with the concept of an appeal. An appeal is a complaint to a higher tribunal of injustice or error committed by an inferior tribunal. Black's Law Dictionary (rev 4th ed). The procedure employed by the IHO was no different than finding facts and making determinations in the first instance. The process followed by the IHO had no semblance of being an appeal. Thus, both the proceeding conducted by the IHO and the decision of the IHO were affected by substantial and material error of law. MCL 24.306(1) (f); MSA 3.560(206)(1)(f).

The IHO's erroneous understanding of the nature of the appeal led to the significant error (and probably one that requires reversal by itself) of placing the burden of proof on appeal on BCBSM. The burden of proof is generally on the appealing party. *Henson v Veterans Cab Co of Flint,* 384 Mich 486, 494; 185 NW2d 383 (1971). See also *Aquilina v General Motors Corp,* 403 Mich 206, 210-211; 267 NW2d 923 (1978). While cases have held that administrative agencies, when necessary, may reallocate the burden of proof, *Zenith Industrial Corp v Dep't of Treasury,* 130 Mich App 464, 468; 343 NW2d 495 (1983); *Superior Public Rights, Inc v Dep't of Natural Resources,* 80 Mich App 72, 80; 263 NW2d 290 (1977), these cases involved the burden of proof at the initial trial-level proceeding, not on appeal.

Even if the burden in this unusual appeal may be shifted to BCBSM, it should be shifted only

where there is a strong reason to do so. There was
no reason here to make BCBSM prove from "square
one" that it satisfied the statutory goals. Indeed,
this ruling of the IHO demonstrates the error in
the case. The IHO's role was to review the IC's
determination, not to determine in the first in-
stance if BCBSM satisfied the goals. BCBSM had to
move to intervene in the appeal. One wonders
where the burden would lie under the IHO's rea-
soning if BCBSM had not chosen to intervene in the
appeal to the IHO.

The "appeal" contemplated by the Legislature
involves a review of the IC's determination, under
§ 510(1), that BCBSM achieved the access and qual-
ity goals and reasonably failed to achieve the cost
goal. Such a review was not conducted by the IHO.
The IHO conducted a complete fact-finding process,
regardless of the accuracy of the facts relied upon
by the IC, and reached his own determination
whether the goals were achieved. Thus, the IHO
substituted his judgment for that of the IC. But it
was the IC whom the Legislature intended to be
primarily responsible for regulating BCBSM. See
§§ 102(2) and 601; 422 Mich 17-18, 49.

Error also is shown in that the result reached by
the IHO violates, or at least ignores, the act's
primary objective of controlling medical costs. *Id.*
at 18. Virtually all of the deficiencies found by the
IHO would increase costs. That was not a concern
of the IHO, because the cost issue was not before
the IHO (in light of BCBSM's failure to appeal the
determination that it failed this goal). The decision
of the IHO was not concerned with balancing the
often conflicting statutory goals, as contemplated
by the Legislature in § 509(4)(b). Because such a
balancing requires administrative expertise, the
administrative determination requires due defer-
ence on review. *Holden v Ford Motor Co,* 439 Mich

257, 268; 484 NW2d 227 (1992); *Wayne-Westland Ed Ass'n v Wayne-Westland Community Schools*, 176 Mich App 361; 439 NW2d 372 (1989); *Traverse Oil Co v Natural Resources Comm Chairman*, 153 Mich App 679, 691; 396 NW2d 498 (1986).

The minimum standard of review of an administrative decision is whether the decision is authorized by law. 1963 Const, art 6, § 28; *J & P Market, Inc v Liquor Control Comm*, 199 Mich App 646, 650; 502 NW2d 374 (1993). This standard applies where no hearing is required to support the administrative decision. *Brandon School Dist v Michigan Ed Special Services Ass'n*, 191 Mich App 257, 263; 477 NW2d 138 (1991). The Legislature obviously intended a broader review in this case, because the appeal is conducted pursuant to contested case procedures of the Administrative Procedures Act and the IHO can thus consider new evidence. But this does not mean that the appeal must be a "square one" determination "de novo."

The act at issue is in many respects a regulatory act similar to acts governing public utilities. A vast number of Michigan citizens are members of BCBSM, presently the only nonprofit health care corporation in the state. The Legislature stated its intent to regulate and supervise such corporations, with the IC being the administrative regulator. Sections 101(2) and 601. To the extent the act is concerned with cost control, the "primary objective" of the act, the act pertains to the rate citizens pay for BCBSM's services. The statutory goals in § 504 are defined in terms of "reasonableness." Reasonableness is a touchstone in determining and reviewing utility rates. *Union Carbide Corp v Public Service Comm*, 431 Mich 135, 148; 428 NW2d 322 (1988); *Michigan Consolidated Gas Co v Public Service Comm*, 389 Mich 624, 634-640; 209 NW2d 210 (1973); *Attorney General v Public*

*Service Comm,* 161 Mich App 506, 515; 411 NW2d 469 (1987).

In legislation governing public utilities, an administrative regulator (here, the IC) is often vested with a wide range of discretion to determine what is reasonable. A utility rate should not be disturbed if it falls between being so high as to be oppressive and so low as to be confiscatory. *Michigan Consolidated Gas Co, supra* at 638; *Michigan Bell Telephone Co v Public Service Comm,* 332 Mich 7, 26; 50 NW2d 826 (1952). A reviewing body should not substitute its judgment for that of the agency where a choice has been made between two reasonably differing views. *Michigan Employment Relations Comm v Detroit Symphony Orchestra, Inc,* 393 Mich 116, 124; 223 NW2d 283 (1974); *Chicago, M, St P & P R Co v Public Service Comm,* 74 Mich App 678, 680; 254 NW2d 39 (1977). This practice is consistent with the policy of giving due deference to the agency's expertise. *Miller Bros v Public Service Comm,* 180 Mich App 227; 446 NW2d 640 (1989).

With the guidance of public utility law in mind —as well as the act's stated policy that there be an expeditious procedure for administrative appeals— the standard to be applied by an IHO on appeal becomes clearer. The IHO reviews the IC's determination (pursuant to § 510) whether the statutory goals were achieved. The determination must be given due deference, because the determination requires the application of considerable expertise. The IC's determination should not be disturbed unless it is so clearly wrong that it is equivalent to the extreme of a confiscatory or oppressive rate. Particularly wide latitude must be given to the IC under the instant act, because the goals (§ 504) the IC examines are themselves couched in terms of

reasonableness. On matters of judgment, the IC's judgment cannot be replaced by that of the IHO.

The IHO may gather facts by way of a contested case proceeding to the extent necessary. This fact-finding process can be used to establish support for the IC's determination or to show that the facts relied upon by the IC were inaccurate or incomplete. The fact-finding process before the IHO is not for the purpose of challenging the IC's judgment. To do so would permit witnesses—staff members, experts, or others—or the IHO to substitute their judgment for that of the IC. The Legislature delegated the authority to regulate and supervise nonprofit health care corporations to the IC, not to anyone else.

In the instant case there was no meaningful dispute about the facts relied upon by the IC in his lengthy and detailed determination report. The extent of provider participation and BCBSM's costs were known to the IC with fair accuracy. What the appeal process produced in this case was testimony about what those facts meant with respect to the statutory goals. There can be as many opinions on this subject as there are persons who think about it. But only the opinion or judgment of the IC matters. It did not matter that Scarane or an expert witness testified that there are standards better than those employed by the IC. The IC certainly did not have to justify a determination different than that recommended by his staff. The fact that physicians and BCBSM members were disenchanted with aspects of their relationships with BCBSM was not something unknown to the IC. The appeal to the IHO in this case resulted in an erroneous displacement of the IC's judgment.

On the basis of the determination report itself and the record developed before the IHO, it is clear that the IC's determination must be affirmed, and

thus no remand is necessary in this case. The IC's
determination was based upon facts and standards
that are not beyond the wide range of reasonable-
ness within which the IC proceeded. It cannot be
said that the IC's judgment was not within the
range of reasonable discretion afforded him when
he chose to rely on the facts that BCBSM had
achieved a statewide service benefit level rate of
ninety percent, an overall participation rate of
sixty-eight percent, and a participation rate in all
nine regions of at least fifty percent or twice the
BCBSM membership percentage in each region in
finding the goal of reasonable access had been
satisfied. Nor can it be said that the IC abused his
discretion when he determined that the goal of
reasonable quality was satisfied by licensure and
utilization review (particularly where not even
medical societies had yet established medical ne-
cessity guidelines) or that a cost increase of 7.4
percent was a reasonable failure of the goal of 6.3
percent (particularly where further data might
show BCBSM was even closer to the actual goal).

## NATURE OF THE INDEPENDENT HEARING OFFICER'S AUTHORITY

We write further to clarify issues that arose in
this case and might arise in future cases.

In an appeal from a determination under
§ 510(1), the IHO may only affirm or reverse the
determination of the IC. Section 515(3)(a). The
approval process for provider class plans then
continues before the IC. In § 515 the Legislature
established a clear differentiation in the relief
available, depending on the action or determina-
tion appealed. The IHO's rulings in this case that
he had continuing jurisdiction to consider the
remedial plan of BCBSM and to decide whether

BCBSM could be granted an extension of time under § 512, MCL 550.1512; MSA 24.660(512), were in conflict with the act, §§ 512 and 513, and exceeded the IHO's authority under § 515(3)(a).

The IHO exceeded his authority in awarding attorney fees and costs. Attorney fees are generally not awarded unless expressly authorized for same by rule or statute. *Matras v Amoco Oil Co,* 424 Mich 675, 695; 385 NW2d 586 (1986); *Larson v Auto-Owners Ins Co,* 194 Mich App 329, 331; 486 NW2d 128 (1992). There is no authority for awarding attorney fees or costs in an appeal to an IHO under part five of the act. That the Legislature did not intend an award of attorney fees is made even clearer by the fact that the Legislature elsewhere in the same act did authorize attorney fees. MCL 550.1210(2); MSA 24.660(210)(2).

The IHO's reasoning that individuals could not appeal under the act without the benefit of attorney fee awards because of the cost of such appeals is belied by the existence of the instant appeal. Further, the IHO did not consider that the Legislature might have intended to discourage, or at least not encourage, appeals regarding relatively minor issues. Appellees' reliance on MCL 24.280(1)(f); MSA 3.560(180)(1)(f), part of Chapter 4 of the Administrative Procedures Act, is misplaced because that statute authorizes attorney fees against agencies and only if the agency took a frivolous position. MCL 24.323(1); MSA 3.560(223)(1). Here, no agency was involved in the appeal, and the award was against BCBSM.

When an IHO reverses the IC's determination that a plan satisfies § 510(1)(a) or (1)(b), that reversal effectively becomes a determination of the IC under § 510(1)(c). Such a determination requires "concise" findings that can be used in order to prepare a remedial plan. The IHO's wholesale in-

corporation by reference of the voluminous arguments and proposed findings of fact and conclusions of law of appellees in this case is worthless as a guide to prepare a remedial plan and is far from concise.

We decline to address issues raised pertaining to the IHO's ruling that the IC could not be called as a witness or deposed and whether IHO Borsos should be disqualified on remand. These issues arise because of unique aspects of this proceeding and need not be discussed in light of our disposition. We do note, however, that the IHO's reliance on MCL 24.282; MSA 3.560(182) in finding fault with the IC's contacts with BCBSM was clear error, because the statute applies to contested case proceedings.

The IHO's decision of August 5, 1991, and all related orders of the IHO are reversed and vacated, and the IC's determination of August 12, 1990, is reinstated. No costs, questions of public concern being presented.

SAWYER J., concurred.

WHITE, J. *(concurring in part and dissenting in part).* I agree that in an appeal from a decision of the Insurance Commission under § 510(1), MCL 550.1510(1); MSA 24.660(510)(1), the independent hearing officer is limited to affirming or reversing the decision of the IC and that the IHO exceeded his authority in requiring that the remedial plan be submitted for his review. I also agree that the IHO exceeded his authority in awarding attorney fees.

I dissent, however, from the majority's reinstatement of the IC's determination. I do not agree that the IHO is required to defer to the judgment of the IC unless it is "so clearly wrong that it is equivalent to the extreme of a confiscatory or oppressive

rate," *ante,* 729 or that the IC's judgment can-
not be challenged on appeal. I am not per-
suaded by the majority's analogy to proceedings
involving the Public Service Commission. The stat-
utes governing "appeals" from administrative de-
terminations of the Public Service Commission
have provided, from at least five years before the
Supreme Court enunciated in *Detroit v Michigan
Railroad Comm,* 209 Mich 395, 433-434; 177 NW
306 (1920) the standard of review relied upon by
the majority, that

> the burden of proof shall be upon the [complain-
> ant/appellant] to show by clear and satisfactory
> evidence that the order of the commission com-
> plained of is unlawful or unreasonable. [MCL
> 462.26(8); MSA 22.45(8), previously MCL 462.26(e);
> MSA 22.45(e), 1915 CL 6706, see also 1915 CL
> 8134(e).]

In contrast, the instant statute provides that the
appeal is to be conducted pursuant to Chapter 4 of
the Administrative Procedures Act, MCL 24.271-
24.287; MSA 3.560(171)-3.560(187), the contested
case provisions. It does not provide that the IHO
must defer to the IC's judgment or otherwise limit
the IHO's authority except to provide in § 515, MCL
550.1515; MSA 24.660(515), the ultimate decisions
open to the IHO in the various appeals permitted
under the Nonprofit Health Care Corporation Re-
form Act.

This Court's review of the IHO's decision is under
Chapter 6 of the Administrative Procedures Act,
MCL 24.301-24.306; MSA 3.560(201)-3.560(206), and
is limited to the determination whether there is
competent, material, and substantial evidence on
the whole record. While it is also appropriate to
set aside an agency decision if substantial rights
have been prejudiced because the decision is in

violation of statute, exceeds the statutory authority, is made upon unlawful procedure resulting in material prejudice to a party, is arbitrary, capricious, or clearly an abuse or unwarranted exercise of discretion, or is affected by other substantial and material error of law, the IHO's decision was not deficient in these respects. The IHO's decision was not contrary to law and, while aspects of his decision exceeded his statutory authority, the decision that the plan did not reasonably satisfy the goals of the act was within his express statutory authority. And, while it may have been appropriate to place the burden of proof on those who appealed the IC's determination rather than placing it on Blue Cross and Blue Shield of Michigan, it is clear from the IHO's decision that the petitioners would have prevailed even if the burden had been placed on them. Thus, any error in placing the burden of proof did not result in material prejudice to BCBSM. Nor did the IHO commit a substantial and material error of law in failing to defer to the judgment of the IC, because he was required under the Administrative Procedures Act to make a decision based upon the record made before him considered as a whole and in accordance with competent, material, and substantial evidence.

Finally, the decision was not arbitrary, capricious, or clearly an abuse or unwarranted exercise of discretion and was based on competent, material, and substantial evidence. There was substantial evidence in the IC's report itself indicating that in certain parts of the state, the access goal was not achieved. This was implicitly recognized by the IC when he stated:

> . . . This decision [that the access goal was met] is based on the fact that BCBSM achieved an overall

service benefit level participation rate of 90%, an overall formal participation rate of 68.3%, and a formal participation rate in every region of the lesser of 50% or twice the BCBSM membership proportion of the population. It is acknowledged that these standards of reasonableness are proxies for more germane standards which relate a target population to an appropriate mix of providers by specialty.

* * *

Insurance Bureau staff believe that a standard based on major specialty and by geographical area may be more appropriate to determine whether BCBSM has met the access goal. Future evaluations of the medical doctor provider class plan therefore may give more weight to the appropriate mix of covered services provided by major specialties.

There was also competent, material, and substantial evidence to support the IHO's finding that the quality goal had not been met. Again, the IC implicitly acknowledged the deficiencies when he recognized that BCBSM applied utilization review programs as a proxy for standards of medical care, that utilization review programs "cannot be responsive to changes in medical knowledge because of their retrospective nature," that "such programs are not effective in identifying widespread practices of over or under utilization of services," that utilization review is unlikely to be effective with providers who participate per case, and that "standards of medical necessity would be preferable to relying so heavily on utilization review to monitor quality of care." The IC also stated:

Bcbsm acknowledged that, during the period under review, it had not provided physicians with medical practice guidelines and protocols that define the reasonable standards that providers are expected to meet. Physician testimony before the

Insurance Bureau demonstrated strong concerns about the difficulty of obtaining prompt, reasonable explanations from BCBSM regarding reimbursement issues, audit determinations, medical necessity determinations, etc., during the period under review. Input from subscribers received through the Insurance Bureau's consumer assistance function also indicated that BCBSM is slow to recognize new medical procedures.

While the IC stated that "some mitigating factors" "must be acknowledged," it appears that he based his decision that BCBSM met the quality of care goal largely on the fact that BCBSM had changed its practice since the end of the review period. Thus, the IHO's conclusion that the plan did not meet the goal for the period in question was supported by the record.

I would affirm the IHO's reversal of the IC's decision approving the plan and reverse the IHO's award of attorney fees and retention of jurisdiction to review the remedial plan. I would require that BCBSM submit a remedial plan to the IC under § 511, MCL 550.1511; MSA 24.660(511). Any appeal under that section would then be a new appeal to be heard by a newly selected IHO.