MICHIGAN INTRA-STATE MOTOR TARIFF BUREAU, INC v
PUBLIC SERVICE COMMISSION

Docket No. 155900. Submitted March 16, 1993, at Lansing. Decided
June 22, 1993, at 10:00 A.M. Leave to appeal sought.

The Public Service Commission issued notice that, pursuant to
authority granted in the Motor Carrier Act, MCL 479.6b(10);
MSA 22.571(2)(10), it would investigate collective ratemaking
agreements of certain motor carriers, including the Michigan
Intra-State Motor Tariff Bureau, Inc., (Intra-State) an associa-
tion of trucking companies, to determine if those agreements
continued to further the state's transportation policy, expressed
in MCL 475.2; MSA 22.532. Following a conference presided
over by a hearing referee, the PSC entered an order stating that
it would preside at the hearings, jointly with the referee, and
establishing an expedited schedule. Motions by Intra-State for
rehearing with regard to the new schedule and for disqualifica-
tion of the PSC chairman were denied. Intra-State participated
in all phases of the proceeding, after which the PSC issued an
opinion and order terminating Intra-State's collective ratemak-
ing agreement. Intra-State appealed. The Court of Appeals,
SHEPHERD, P.J., and MICHAEL J. KELLY and FITZGERALD, JJ.,
denied Intra-State's motion to stay the order of the PSC in an
order dated November 18, 1992. The Supreme Court, in lieu of
granting leave to appeal, granted the motion for a stay of the
PSC's order pending substantive review by the Court of Appeals.
441 Mich 901 (1992).

The Court of Appeals *held:*

1. The PSC's actions were clearly within the authority granted
to it by the Legislature. The PSC exercised legislative authority
when it initially approved and when it later terminated Intra-
State's collective ratemaking agreement. These decisions were
based on transportation policy established by the Legislature in

REFERENCES

Am Jur 2d, Administrative Law § 64; Carriers §§ 105-141; Public
Utilities §§ 230-291.

When will member of federal regulatory board, commission, author-
ity, or similar body be enjoined from participating in rulemaking
or adjudicatory proceeding because of "personal bias or other
disqualification" under 5 USCS § 556(b). 51 ALR Fed 400.

MCL 475.2; MSA 22.532 and left to the PSC to interpret. The actions of the PSC were lawful, reasonable, and expressly authorized by MCL 479.6b(10); MSA 22.571(2)(10).

2. The PSC's initial approval of Intra-State's collective ratemaking agreement did not create a "license" within the meaning of the Administrative Procedures Act. Modification or termination of a ratemaking agreement does not operate as a modification or termination of a carrier's license, but, rather, the manner in which the carrier is permitted to operate under the Motor Carrier Act. By enacting MCL 479.6b(10); MSA 22.571(2)(10), the Legislature created a process other than a "license revocation" proceeding in order to enforce the PSC's ratemaking functions.

3. Because the PSC was conducting an investigation under MCL 479.6b(10); MSA 22.571(2)(10), the concepts relating to license revocations regarding prior notification of charges and an opportunity to comply were inapplicable. Under subsection 10, an agreement that does not further the state's transportation policy can be terminated with no proof of wrongdoing. Intra-State was entitled to and received reasonable notice of and an opportunity for a hearing before the PSC entered its order.

4. The denial of the motion for disqualification of the PSC chairman was proper. Intra-State did not make a meaningful showing that the chairman was biased or had prejudged the issues. Pursuant to MCL 24.279; MSA 3.560(179), the chairman had the power to determine whether disqualification was necessary.

5. The PSC had the authority, pursuant to MCL 24.279, 24.280; MSA 3.560(179), 3.560(180), to take charge of the proceedings. The PSC's rules placed it in control of the hearing schedule.

6. The PSC's decision was not a collateral attack on its original approval of Intra-State's collective ratemaking agreement.

7. The findings of the PSC were supported by competent, material, and substantial evidence on the whole record.

Affirmed.

1. CARRIERS — MOTOR VEHICLE CARRIERS — COLLECTIVE RATEMAKING AGREEMENTS — PUBLIC SERVICE COMMISSION.

The supervision of collective ratemaking agreements concerning motor vehicle carriers is part of the Public Service Commission's overall ratemaking authority and a legislative function of the commission; approval of collective ratemaking agreements

by the commission is permissible where they meet certain conditions and further the state's transportation policy (MCL 475.2, 476.10, 479.6b; MSA 22.532, 22.543, 22.571[2]).

2. CARRIERS — MOTOR VEHICLE CARRIERS — COLLECTIVE RATEMAKING AGREEMENTS — PUBLIC SERVICE COMMISSION — LICENSES.

The Public Service Commission's approval of motor vehicle carriers' collective ratemaking agreements pursuant to the Motor Carier Act does not create a "license," and the subsequent modification or termination of an agreement approved by the commission is not a modification or termination of a "license" to which the due process protection of the Administrative Procedures Act applies (MCL 24.205[1], 24.292, 475.1 *et seq.*; MSA 3.560[105][1], 3.560[192], 22.531 *et seq.*).

3. CARRIERS — MOTOR VEHICLE CARRIERS — COLLECTIVE RATEMAKING AGREEMENTS — PUBLIC SERVICE COMMISSION — STATE TRANSPORTATION POLICY.

The Public Service Commission may, upon it own initiative, investigate and determine whether collective ratemaking agreements of motor vehicle carriers previously approved by the commission pursuant to the Motor Carrier Act continue to further the state's transportation policy; an agreement that does not further that policy may be modified or terminated with no proof of wrongdoing; interested parties must be afforded reasonable notice and an opportunity for a hearing (MCL 479.6b[10]; MSA 22.571[2][10]).

4. ADMINISTRATIVE LAW — DUE PROCESS — BIAS OR PREJUDICE.

A decisionmaker's partiality is called into question where the decisionmaker has a pecuniary interest in the outcome, has been the target of personal abuse or criticism from the party involved, is enmeshed in other matters involving the party, or might have prejudged the case because of prior participation as an accuser, investigator, factfinder, or initial decisionmaker; a decisionmaker may be familiar with the facts of a case and need not be disqualified even after having taken a position regarding a related policy issue.

5. ADMINISTRATIVE LAW — DUE PROCESS — BIAS OR PREJUDICE.

A party does not have to show actual bias by a decisionmaker in order to have the decisionmaker disqualified, but must show a risk or probability of unfairness that is too high to be constitutionally permissible.

*Foster, Swift, Collins & Smith, P.C.* (by *Webb A. Smith, Robert E. McFarland,* and *Kathryn M.*

*Niemer*), for Michigan Intra-State Motor Tariff Bureau, Inc.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Don L. Keskey* and *Richard M. Karoub,* Assistant Attorneys General, for the Public Service Commission.

*Hill Lewis* (by *Nancy L. Lukey*), for the Association for Safe and Competitive Transportation and the American Automobile Manufacturers Association.

Amici Curiae:

*James P. Hoffa, P.C.* (by *James P. Hoffa*), for the International Brotherhood of Teamsters.

*Sachs, Waldman, O'Hare, Helveston, Hodges & Barnes, P.C.* (by *Theodore Sachs*), for Michigan State AFL-CIO.

Before: DOCTOROFF, C.J., and HOLBROOK, JR., and SAWYER, JJ.

PER CURIAM. The Michigan Intra-State Motor Tariff Bureau, Inc., appeals as of right the August 14, 1992, decision of the Public Service Commission that terminated appellant's collective rate-making agreement. See MCL 479.20; MSA 22.585 and MCL 462.26; MSA 22.45. We affirm.

Appellant is an association, known as a "bureau," of trucking companies of various sizes. Appellant's members are general commodity carriers who operate throughout Michigan. There are similar carriers operating in Michigan who are not members of appellant. Through appellant, and with the approval of the PSC, appellant's members are able to establish collectively the rates they

charge shipping customers. Ratemaking in this collective fashion was recognized by our Legislature when it adopted MCL 479.6b; MSA 22.571(2), enacted as part of 1982 PA 399. Moreover, collective ratemaking has been practiced for several decades.

All rates charged by common carriers, including collectively established rates, must be just and reasonable and must not be unjustly discriminatory. MCL 476.7; MSA 22.540. The PSC is charged with the duty of supervising and regulating rates. MCL 476.10; MSA 22.543. It is axiomatic that ratemaking is a legislative function. *Michigan Consolidated Gas Co v PSC,* 389 Mich 624, 644; 209 NW2d 210 (1973) (WILLIAMS, J., dissenting); *Attorney General v PSC No 2,* 133 Mich App 790, 798-799; 350 NW2d 320 (1984).

MCL 479.6b; MSA 22.571(2) requires collective rates to be established pursuant to an agreement that must be approved by the PSC. Approval is permissible only if certain conditions are satisfied and the PSC finds that the agreement is in furtherance of the statutory transportation policy set forth in § 2 of the Motor Carrier Act, MCL 475.2; MSA 22.532. When the PSC approves an agreement, the collectively established rates may be charged. In addition, those rates may be changed with PSC approval. Thus, the supervision of collective ratemaking agreements is largely part of the PSC's overall ratemaking authority and a legislative function of the PSC.

The PSC initially approved appellant's collective ratemaking agreement by an order entered on March 5, 1985. Appellant's application for approval was published, there was no opposition to the application, and the PSC found the application to comply with the statutory requirements. The PSC also found that the application would further

the transportation policy expressed in MCL 475.2; MSA 22.532.

On January 17, 1992, the PSC issued a notice that it intended to investigate collective ratemaking and to consider whether previously approved collective ratemaking agreements continued to further transportation policy. The notice was published and was sent to five bureaus, including appellant. The PSC's authority for its investigation was MCL 479.6b(10); MSA 22.571(2)(10), which provides:

> The commission is authorized, upon complaint or upon its own initiative, to investigate and determine whether any agreement previously approved by it under this section, or terms and conditions upon which the approval was granted, is not or are not, in furtherance of the transportation policy set forth in section 2 of article I, or whether the terms and conditions are unnecessary for the purposes of conformity with that policy. After investigation, the commission shall, by order, terminate or modify its approval of the agreement, or the terms and conditions of approval, if it finds the action necessary to assure conformity with the policy. The effective date of any order terminating or modifying approval, or modifying terms and conditions, shall be postponed for a period which the commission determines to be reasonably necessary to avoid undue hardships.

A conference was held on February 11, 1992, with a hearing referee presiding. The parties present, including intervening parties the Association for Safe and Competitive Transportation and the American Automobile Manufacturers Association, agreed to a hearing schedule, accepted by the referee, that placed appellant in a responsive position. By an order entered on February 27, 1992, the PSC ordered that it would preside at the hear-

ings (jointly with the referee) and established an expedited schedule that required the simultaneous filing of prepared testimony by all parties on March 31, 1992, cross-examination of all witnesses on April 13 to 15, and simultaneous filing of briefs two weeks later. Appellant moved for a rehearing regarding the new schedule and also moved for disqualification of Steven Fetter, the PSC chairman. Rehearing was denied on April 1, and the motion to disqualify was denied at the outset of the hearing on April 13.

Prepared testimony was filed by all parties and cross-examination took place as scheduled. The PSC permitted rebuttal testimony between May 8 and May 11. Briefs of all parties were filed on June 1. Appellant participated in all phases of the proceeding, submitting testimony of eleven witnesses and filing an extensive brief. In an opinion and order issued on August 14, 1992, the PSC (with one commissioner dissenting) determined that there were "at least" six reasons why appellant's collective ratemaking agreement should be terminated. All of these reasons related to the transportation policy set forth in MCL 475.2; MSA 22.532. The PSC continued its approval of the collective ratemaking agreement of two other bureaus, modified its approval of the agreement of another bureau, and terminated its approval of the agreement of a fifth bureau. After this Court denied the appellant's motion for a stay of the PSC's order, our Supreme Court, in lieu of granting leave to appeal, stayed the PSC's order with regard to appellant pending this appeal. 441 Mich 901 (1992).

Appellant has the burden of proving by clear and satisfactory evidence that the PSC's order is unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8). Appellant must show that the PSC's order was arbitrary, capricious, an abuse of discretion,

or not supported by the record. *Consumers Power Co v PSC,* 189 Mich App 151, 183; 472 NW2d 77 (1991). The PSC's findings must be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28. The testimony of even one expert can be "substantial" evidence. *Ass'n of Businesses Advocating Tariff Equity v PSC,* 192 Mich App 19, 27; 480 NW2d 585 (1991). This Court gives due deference to the PSC's administrative expertise and will not substitute its judgment for that of the PSC. *Id.* In legislative matters, such as setting rates, this Court must defer to the PSC. See *Colony Park Apartments v PSC,* 155 Mich App 134, 138; 399 NW2d 32 (1985).

This case is intricately connected with an aspect of the PSC's ratemaking function, a matter with which we do not interfere. The PSC exercised legislative authority when it initially approved and when it later terminated appellant's collective ratemaking agreement. These decisions were based on transportation policy established by the Legislature under MCL 475.2; MSA 22.532 and left to the PSC to interpret. We find nothing unlawful or unreasonable in the PSC's actions, all of which were expressly authorized by MCL 479.6b(10); MSA 22.571(2)(10). To the extent that the PSC found facts, those findings were supported by ample evidence, including the testimony of staff witness Thomas Lonergan, the director of the PSC's motor carrier regulatory section.

Appellant first argues that it was deprived of several procedural protections afforded a licensee before the administrative termination of a license. Among other things, appellant argues it received no preliminary notice of charges and had no informal opportunity to comply, as required by *Rogers v State Bd of Cosmetology,* 68 Mich App 751; 244 NW2d 20 (1976). Appellant further argues it was

not afforded the due process protection of MCL 24.292; MSA 3.560(192), § 92 of the Administrative Procedures Act, regarding revocation of licenses.

The APA defines a license as including the "whole or part of an agency permit, certificate, approval, registration, charter, or similar form of permission required by law, but does not include a license required solely for revenue purposes." MCL 24.205(1); MSA 3.560(105)(1); *Bukhtia v Bureau of State Lottery,* 190 Mich App 323, 325; 475 NW2d 475 (1991). We do not view the PSC's approval of appellant's collective ratemaking agreement in 1985 to have created a "license" within the meaning of the APA.

Pursuant to the terms of the Motor Carrier Act, MCL 475.1 *et seq.*; MSA 22.531 *et seq.*, a motor common carrier may not operate upon a public highway without first having obtained a "certificate of authority." MCL 476.1; MSA 22.534. The act contains a specific definition of "certificate of authority" as a certificate issued to a carrier "authorizing a transportation service," which certificate is issued under the terms of the act. See MCL 475.1(j); MSA 22.531(j). The act also defines and provides for issuance of "permits" to operate as a motor contract carrier. MCL 475.1(k); MSA 22.531(k). The issuance of a certificate or permit is governed by specific statutory provisions and are akin to "licenses" as defined by the APA.

In contrast, we do not believe that the approval of certain ratemaking agreements is a "license," as that term is commonly understood. When the PSC terminates an agreement for collective ratemaking, the common carriers are still able to operate under the terms of the act, albeit not under the terms of the agreement that has been invalidated. We perceive this approval or disapproval of a ratemaking agreement as nothing more than PSC

enforcement of the stated goals of the act and as an internal control of the manner in which licensees may operate. Thus, when a previously approved agreement is terminated under the provisions of MCL 479.6b(10); MSA 22.571(2)(10), the psc is merely policing the manner in which a licensee is permitted to operate within the act. Modification or termination of a ratemaking agreement does not operate as a modification or termination of a carrier's license. Rather, it is merely an attempt to force a licensee to operate in furtherance of the stated transportation goals of MCL 475.2; MSA 22.532.

MCL 479.6b(10); MSA 22.571(2)(10) expressly authorizes the psc—upon its own initiative—to investigate and determine whether "any agreement previously approved" furthers state transportation policy. Subsection 10 further permits the psc to terminate previously approved collective ratemaking agreements if the psc deems it necessary to do so in order to assure conformity with transportation policy. It is obvious that the Legislature created a process other than a "license revocation" proceeding in order to enforce the ratemaking functions embodied in the psc. The Legislature provided for an investigation and for psc reflection on the usefulness of continuing collective ratemaking agreements. This provides an opportunity for the psc to respond to changed circumstances, to terminate a valid agreement that has not furthered transportation policy on the whole, and to correct a mistake in previously approving an agreement.

Because the psc was conducting an investigation under MCL 479.6b(10); MSA 22.571(2)(10), the concepts of prior notification of charges and an opportunity to comply were inapplicable. The hearing here was an investigation, a process that might

lead to specific charges of wrongdoing. But under subsection 10 an agreement can be terminated with no proof of wrongdoing; the fundamental concern being whether transportation policy is being furthered by the agreement.

Next, appellant argues that it was deprived of an impartial decisionmaker as well as several due process safeguards, including those recognized in MCL 24.271(2)(d); MSA 3.560(171)(2)(d).

Appellant was entitled to an impartial decisionmaker who had not prejudged the issues. *Crampton v Dep't of State,* 395 Mich 347; 235 NW2d 352 (1975). In *Crampton,* our Supreme Court identified four situations that would call into question a decisionmaker's partiality:

> (1) [the decisionmaker] has a pecuniary interest in the outcome;
> (2) [the decisionmaker] "has been the target of personal abuse or criticism from the party before him";
> (3) [the decisionmaker] is "enmeshed in [other] matters involving petitioner . . ."; or
> (4) [the decisionmaker] might have prejudged the case because of prior participation as an accuser, investigator, fact finder or initial decisionmaker. [*Id.* at 351. Citations omitted.]

A decisionmaker may be familiar with the facts of a case and need not be disqualified even after having taken a position regarding a related policy issue. *Livonia v Dep't of Social Services,* 123 Mich App 1, 19-20; 333 NW2d 151 (1983), aff'd 423 Mich 466; 378 NW2d 402 (1985).

In this case, appellant relies on a series of memoranda and letters, as well as a letter to the editor of the Detroit News signed by all three commissioners, to demonstrate that Chairman Fetter was partial. These documents show that Fetter

and others thought that deregulation of the trucking industry would be beneficial and that termination of collective ratemaking should be considered. In *Ferrario v Escanaba Bd of Ed,* 426 Mich 353, 379-380; 395 NW2d 195 (1986), our Supreme Court held that although actual bias does not have to be shown, a party seeking disqualification of a decisionmaker must still show a risk or probability of unfairness that is too high to be constitutionally permissible. See also *Hagerty v State Tenure Comm,* 179 Mich App 109, 113; 445 NW2d 178 (1989). Regardless of Fetter's beliefs before the hearing, appellant has not shown that there was an intolerable risk of partiality. If Fetter and the PSC had concerns about collective ratemaking, an investigation under MCL 479.6b(10); MSA 22.571(2)(10) was an appropriate action.

We note that only three of the five agreements under consideration were terminated. Appellant's concerns about Fetter ruling on appellant's motion to disqualify are immaterial because appellant has not made a meaningful showing that Fetter was biased or had prejudged the issues before him. Moreover, under MCL 24.279; MSA 3.560(179), an agency may determine questions of disqualification. Inasmuch as Fetter was the chairman of the agency, he had the statutory power to determine whether disqualification was necessary. We do not construe the previously expressed opinions of Fetter with regard to the agreements as demonstrative of intolerable partiality. Rather, the opinions were merely a part of the determination to revisit the ratemaking agreements at issue to see whether they continued to further the stated goals of the transportation policy.

Appellant's remaining procedural due process arguments have largely been answered in the discussion of appellant's first issue. The proceeding

was an investigation under MCL 479.6b(10); MSA 22.571(2)(10). MCL 479.6b(11); MSA 22.571(2)(11) requires only that interested parties be afforded reasonable notice and an opportunity for a hearing before the PSC enters any orders under MCL 479.6b; MSA 22.571(2). Here, the January 17, 1992, notice (published and sent to appellant) indicated the scope of the investigation and the possibility that collective ratemaking agreements would be terminated. Appellant exhaustively participated from pretrial conference through briefing. More-over, the PSC was within its authority to take charge of the proceeding, MCL 24.279; MSA 3.560(179) and MCL 24.280; MSA 3.560(180). The PSC's rules at the time placed it in control of the hearing schedule. 1979 AC, R 460.46(2).

Appellant's third argument is inconsistent with the plain language of MCL 479.6b(10); MSA 22.571(2)(10). Appellant argues that the Legisla-ture "sanctified" collective ratemaking when it enacted MCL 479.6b(10); MSA 22.571(2)(10), that termination of collective ratemaking agreements "must by implication necessarily" be related to a violation of the agreement or of a rule or statute, and that the Legislature never intended an end to collective ratemaking. We disagree.

MCL 479.6b(10); MSA 22.571(2)(10) authorizes the PSC to investigate previously approved collec-tive ratemaking agreements to determine if those agreements are in furtherance of transportation policy. The statute does not require an investiga-tion or a termination to be preceded by, or condi-tioned upon, a violation of the agreement, or of anything else for that matter. The Legislature expressly authorized the PSC to act on its own initiative, leaving it to the PSC to decide whether specific collective ratemaking agreements fur-thered state transportation policy. The Legislature

clearly contemplated that collective ratemaking agreements might not further those policies. The PSC's actions were clearly within the authority granted to it by the Legislature. See *Union Carbide Corp v PSC,* 431 Mich 135, 142; 428 NW2d 322 (1988).

In its next issue, appellant characterizes the PSC's order as an invalid collateral attack on the PSC's March 5, 1985, approval of appellant's collective ratemaking agreement. This argument fails because the Legislature expressly authorized the PSC to investigate—and terminate, if necessary—previously approved collective ratemaking agreements. Although we do not view the PSC's decision as a collateral attack on a previous order because the proceeding here was an exercise of the PSC's legislative authority under MCL 479.6b(10); MSA 22.571(2)(10), to the extent there was a collateral attack, it was valid under the statute. Moreover, circumstances did change between 1985 and 1992, including a severe recession, several rate increases granted to appellant, and the financial deterioration of appellant's members.

In its final issue, appellant argues that there was inadequate support for each of the six reasons discussed by the PSC for terminating appellant's collective ratemaking agreement. Appellant further argues that the PSC ignored portions of the record, particularly those portions regarding the benefits of collective ratemaking. We conclude that the PSC's findings were supported by competent, material, and substantial evidence on the whole record, Const 1963, art 6, § 28, and that appellant gives too little deference to the PSC. All of the reasons cited by the PSC were directly related to the transportation policy expressed in MCL 475.2;

MSA 22.532. Also, the PSC's determination rested upon the totality of the circumstances, and no one finding was necessarily controlling.

Affirmed.