GTE NORTH INCORPORATED v PUBLIC SERVICE COMMISSION

MICHIGAN BELL TELEPHONE COMPANY v PUBLIC SERVICE COMMISSION

Docket Nos. 177802, 177886. Submitted August 2, 1995, at Lansing. Decided January 12, 1996, at 9:50 A.M.

MCI Telecommunications Corporation filed a complaint in the Public Service Commission against Michigan Bell Telephone Company and GTE North Incorporated, alleging violations of the Michigan Telecommunications Act, 1991 PA 179, MCL 484.2101 *et seq.*; MSA 22.1469(101) *et seq.*, effective January 1, 1992, to January 1, 1996, relative to the failure of Michigan Bell and GTE to provide intraLATA 1+ dialing parity, i.e., a dialing arrangement for long distance telephone calls within local access transport areas where 1 plus the seven-digit number to be called is dialed regardless of whether the intraLATA toll service provider is a local exchange carrier like Michigan Bell and GTE or is an interexchange carrier like MCI and AT&T. Several parties, including AT&T, the Attorney General, and the Michigan Exchange Carriers Association, intervened in the proceedings before a hearing referee and the commission. The commission dismissed the complaint and deferred consideration of whether intraLATA dialing parity should be implemented. MCI subsequently moved for reconsideration of the complaint. The commission remanded the matter to a hearing referee for further testimony and argument regarding whether intraLATA dialing parity should be implemented in light of a proposed entry by Michigan Bell into the interLATA long distance market, subject to the approval of the federal government. Following the hearing before the referee, the commission decided that intraLATA dialing parity is necessary for effective competition and would be in the public interest in light of Michigan Bell's anticipated entry into the interLATA long distance market. The commission ordered Michigan Bell and GTE to provide intraLATA dialing parity no later than January 1, 1996. Petitions by Michigan Bell and GTE for rehearing and

REFERENCES

Am Jur 2d, Telecommunications § 20.

See ALR Index under Telecommunications.

reconsideration were denied by the commission. GTE and Michigan Bell appealed and the Michigan Exchange Carriers Association cross appealed. The appeals were consolidated.

The Court of Appeals *held:*

1. Authority to implement intraLATA dialing parity is granted to the Public Service Commission under § 205(2) of the Michigan Telecommunications Act, MCL 484.2205(2); MSA 22.1469(205)(2), which provides that the commission may require changes in how a telecommunication service is provided if the commission finds, after notice and hearing, that the quality, general availability, or conditions for the regulated service violate the act or an order of the commission or is adverse to the public interest.

2. The commission followed proper procedure in implementing intraLATA dialing parity pursuant to authority granted under § 205(2). The commission found that continuation of intraLATA dialing disparity would be adverse to the public interest. Section 205(2) expressly empowers the commission to investigate and resolve complaints. MCI's complaint raised the issue of intraLATA dialing disparity as being adverse to the public interest for purposes of § 205(2).

3. The "public interest" standard of § 205(2) is not vague, does not constitute an unconstitutional delegation of legislative power, and was applied in a nonarbitrary fashion by the commission in this case.

4. The commission's decision to require intraLATA dialing parity is not arbitrary, capricious, or an abuse of discretion, and it is supported by competent, material, and substantial evidence.

Affirmed.

TELECOMMUNICATIONS — PUBLIC SERVICE COMMISSION — INTRALATA DIALING PARITY — MICHIGAN TELECOMMUNICATIONS ACT.

The Public Service Commission, upon finding that the continuation of a disparity between local exchange carriers and interexchange carriers in dialing procedures for long distance telephone calls within local access transport areas is adverse to the public interest, is authorized under the Michigan Telecommunications Act to require intraLATA dialing parity; a decision by the commission to require such parity must not be arbitrary, capricious, or an abuse of discretion, and it must be supported by competent, material, and substantial evidence (1991 PA 179, MCL 484.2205[2]; MSA 22.1469[205][2]).

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting,*

*P.C.* (by *William D. Parsley* and *Gary L. Field*), *William H. Keating,* and *A. Randall Vogelzang,* for GTE North Incorporated.

*Michael A. Holmes* and *Craig A. Anderson* (*James A. Ault,* of Counsel), for Michigan Bell Telephone Company.

*Don L. Keskey* and *David A. Voges,* Assistant Attorneys General, for the Public Service Commission.

*Dykema Gossett* (by *Albert Ernst* and *Michael A. McMenamin*), *Marcia Franklin* and *Joan Campion,* for MCI Telecommunications Corporation.

*Fischer, Franklin & Ford* (by *George Hogg, Jr.,* and *Sidney M. Berman*), and *Larry Salustro* and *Robin P. Charleston,* for AT&T Communications of Michigan, Inc.

*Foster, Swift, Collins & Smith, P.C.* (by *Stephen D. Schultz* and *Glen A. Schmiege*), for the Michigan Exchange Carriers Association, Inc.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Orjiakor N. Isiogu,* Assistant Attorney General, for the Attorney General.

Before: HOEKSTRA, P.J., and HOOD and D. M. CURTIS,* JJ.

PER CURIAM. GTE North, Inc., and Michigan Bell Telephone Company appeal as of right orders of the Michigan Public Service Commission that require GTE and Michigan Bell to implement

* Recorder's Court judge, sitting on the Court of Appeals by assignment.

uniform dialing arrangements for certain intrastate long distance telephone calls by January 1, 1996. The PSC, AT&T Communications of Michigan, Inc., MCI Telecommunications Corporation, and the Attorney General respond as appellees. We affirm.

I

This case concerns toll service for long distance telephone calls within Local Access Transport Areas (LATAS). LATAS comprise geographic regions, generally corresponding to telephone area code regions, which were created pursuant to divestiture of the Bell operating companies in the early 1980s. There are five LATAS in the State of Michigan.

According to divestiture decrees in federal court, Local Exchange Carriers (LECS) such as GTE and Michigan Bell may provide "intraLATA" toll services for long distance calls within a LATA, but are prohibited from providing toll service for calls between LATAS, i.e., "interLATA" service. Accordingly, calls between LATAS are currently handled by Interexchange Carriers (IXCS) such as AT&T and MCI, and many others.

The current dialing arrangements for intraLATA calls serviced by GTE or Michigan Bell only require the caller to add a single digit "prefix" number at the beginning of the number to be called. This is known as "1+" or "0+" dialing, depending on whether the required prefix number is a 1 or a 0. When the PSC authorized IXCS such as AT&T and MCI to compete in the Michigan intraLATA market in the late 1980s, it allowed GTE and Michigan Bell to retain exclusive use of "1+" and "0+" dialing arrangements for most of their own intraLATA toll services. The dialing arrangements

for most intraLATA toll service provided by the IXCs require the caller to dial a five-digit "10xxx" prefix number, with the "xxx" being a three-digit carrier identification code assigned to each IXC, e.g., 1+0+ATT for AT&T's service.

In its December 21, 1989, decision on intraLATA competition in PSC Nos. U-9004, U-9006, and U-9007, the PSC found that the "10xxx" dialing arrangement provided the IXCs with "equal access" to GTE's and Michigan Bell's local exchange networks as required by federal authorities. In declining to require uniform 1+ dialing arrangements for all intraLATA service by all providers, sometimes called "dialing parity" or "presubscription,"[1] the PSC reasoned that any competitive advantage GTE or Michigan Bell received from exclusive use of 1+ or 0+ dialing was offset by other competitive advantages held by the IXCs, such as the ability of the IXCs to service both the intraLATA and interLATA markets. The PSC also reasoned that because the type of "two-PIC" technology required to allow customers to choose separate carriers for their intraLATA and interLATA calls was not yet feasible, implementation of presubscription for intraLATA calls would have the effect of driving GTE and Michigan Bell out of the intraLATA toll market completely, since customers could only choose an IXC to handle both their intraLATA and interLATA calls.

After the PSC's 1989 decision in Nos. U-9004, U-9006, and U-9007, the Legislature enacted the Michigan Telecommunications Act, 1991 PA 179,

---

[1] We acknowledge that Michigan Bell declines to use the term "intraLATA dialing parity," preferring instead the term "intraLATA presubscription," apparently on the theory that "dialing parity" misstates the inequality of competitive positions that may result if the uniform intraLATA dialing arrangements are implemented before LECs are allowed to provide interLATA toll services. However, we consider the concepts of "dialing parity" and "presubscription" virtually synonymous and will therefore use those terms interchangeably.

MCL 484.2101 *et seq.*; MSA 22.1469(101) *et seq.*, effective January 1, 1992, which repealed and replaced public acts of 1883 and 1913 regulating telephone service. Act 179 invests the PSC with regulatory authority over certain telecommunication services, including basic local exchange, access, and toll services, while placing certain limits on the PSC's oversight of such regulated services and generally negating the PSC's authority over other, unregulated telecommunication services. In this manner, the act tends to deregulate the telecommunication industry with a view toward fostering competition between telecommunication service providers. This intent is perhaps best reflected in § 103 of the act, which provides:

> Except as otherwise provided in this act, this act shall not be construed to prevent any person from providing telecommunication services in competition with another telecommunication provider. [MCL 484.2103; MSA 22.1469(103).]

The act has a "sunset" expiration date of January 1, 1996. MCL 484.2604; MSA 22.1469(604).

The only place where Act 179 expressly addresses the subject of intraLATA dialing parity is a provision in § 202(f) of the act regarding various matters to be included in a report from the PSC to the Legislature and the Governor due January 1, 1994. Specifically, § 202(f)(x) required the PSC to report upon the technological and economical impact of dialing parity within LATAS:

> In addition to the other powers and duties prescribed by this act, the commission shall do all of the following:
>
> \*   \*   \*
>
> (f) Issue a report to the legislature and governor

on or before January 1, 1994. The report shall include all of the following:

* * *

(x) The technological and economical impact of the implementation of INTRA-LATA 1-plus dialing parity within LATAS. [MCL 484.2202; MSA 22.1469(202).]

The above language was added by an amendment in the House of Representatives after the Senate had already approved the original version of the act. The House version also contained another amendment of § 312 of the act (offered by Representatives Power and Bandstra) directing the PSC to implement intraLATA dialing parity when the PSC determines it to be technologically and economically feasible:

(3) The commission shall order the implementation of intraLATA 1-plus dialing parity for all toll carriers offering services within the LATA when the commission determines that such parity is technically and economically feasible.

However, the Power/Bandstra amendment was ultimately deleted from the final version of the act following review of a House-Senate joint conference committee.

The instant PSC proceedings were instituted on July 31, 1992, when MCI filed a complaint with the PSC alleging that GTE and Michigan Bell had violated § 312(4) and various provisions of § 305 of Act 179 with regard to intraLATA access by failing to provide 1+ dialing parity. MCI also alleged that the current intraLATA dialing arrangements are adverse to the public interest in violation of § 205(2) of the act.

Section 205 of Act 179 provides:

(1) The commission may investigate and resolve complaints that concern the quality and availability, conditions, deposit requirements, or disconnection of a regulated service, or any other provision of this act that regulates service.

(2) If the commission finds, after notice and hearing, that the quality, general availability, or conditions for the regulated service violate this act or an order of the commission under this act, or is adverse to the public interest, the commission may require changes in how the telecommunication services are provided. The commission's authority includes, but is not limited to, the revocation of a license and issuing cease and desist orders. [MCL 484.2205; MSA 22.1469(205).]

A contested case hearing was conducted before a hearing referee in late 1992. AT&T, the Attorney General, and appellee Michigan Exchange Carriers Association (MECA), among others, intervened in the proceedings.

In an opinion and order issued on February 23, 1993, the PSC followed the recommendations of the hearing referee by dismissing MCI's complaint and deferring consideration of whether the PSC should implement intraLATA dialing parity until some future time. Although the PSC found no violations of §§ 305 and 312(4) of Act 179, it agreed with MCI that it is empowered to implement intraLATA dialing parity pursuant to its authority under § 205 of the act to regulate how telecommunication services are provided. The PSC declined to determine whether continuing the existing dialing arrangements would be adverse to the public interest at that time, however, noting that various issues regarding implementation of intraLATA dialing parity remained unresolved, such as the potential economic effect upon GTE and Michigan Bell, the potential effect upon the quality and level of toll

services throughout the state and the cost and feasibility of necessary technology.

MCI moved for reopening, rehearing, and reconsideration of the PSC's February 23, 1993, order. Among other things, MCI noted that Michigan Bell's parent company, Ameritech, had recently sought federal court approval of a plan that would allow its telephone operating companies, such as Michigan Bell, to begin competing in the interLATA long distance market. Specifically, Ameritech had filed a petition before the Federal Communications Commission for a modified regulatory model called "Customer First: American Universal Access Plan" (CFP), which essentially proposed opening Ameritech's local exchanges to competition with 1+ dialing in return for removal of its interLATA restrictions. MCI also noted a recent order of the Minnesota Public Utilities Commission (MPUC) reaffirming its previous finding that 1+ dialing was in the public interest in Minnesota. MCI's motion was supported by AT&T and the PSC staff, but opposed by Michigan Bell, GTE, and the MECA.

In an order entered on May 21, 1993, the PSC denied that part of MCI's motion which requested rehearing and reconsideration of the dismissal of its complaint, but granted the motion in part by remanding the case to the hearing referee for the purpose of receiving further testimony and argument regarding the effect of Ameritech's CFP proposal, as well as the recent decision of the MPUC, with regard to the implementation of intraLATA dialing parity in Michigan. The PSC explained its reasons for reopening the record as follows:

> The Commission finds that the filing of Ameritech's petition with the FCC and the MPUC's order require the reopening of this proceeding. The Commission deferred implementation of intraLATA dial-

ing parity to a later date based, in part, on the fact that Michigan Bell and GTE are precluded from participating in the interLATA toll market. As a result, they may be at a significant disadvantage because they may experience a significant loss in toll revenue if intraLATA dialing parity is implemented. In addition, MCI and the Staff maintained that the two-PIC technology is available today, while Michigan Bell insisted that it will not be available for all switches until 1996, and it would then take three years to complete network deployment. Based on this conflicting evidence, the Commission found that the time frames, costs, and availability of the technology for intraLATA dialing parity require further examination.

The filing of Ameritech's petition with the FCC now calls into question the underlying facts upon which the Commission based its decision to defer the issue of intraLATA dialing parity to a later date. As MCI correctly points out, Ameritech is now formally seeking expedited authority to participate in the interLATA toll market. This request casts doubt on Michigan Bell's representations in this case that it will not be able to fully deploy the two-PIC technology until 1999. Furthermore, the granting of Ameritech's petition may result in Ameritech being able to provide interLATA toll service, while MCI and other IXCs would not have intraLATA dialing parity for six months to two years thereafter. Such a result would be inconsistent with the Commission's view that competition is most effective when the participants can compete fully and fairly on a level playing field.

Based on the foregoing discussion, the Commission agrees with the Staff that further study of these issues now will provide the Commission with the information needed to implement intraLATA dialing parity if and when Ameritech receives FCC and court approval. Accordingly, the Commission finds that this proceeding should be reopened to analyze the effect of Ameritech's petition, as well as the MPUC's March 9, 1993 order, on the decision to implement intraLATA dialing parity in Michi-

gan. An analysis of this information is appropriate so that the Commission may reevaluate its determinations based on a full and complete record. Finally, although GTE will not be affected by Ameritech's petition, the Commission agrees with the Staff that this proceeding should be used to establish an overall policy that would also apply to GTE.

In its February 24, 1994, opinion and order after remand, the PSC majority opined that Ameritech's CFP proposal and other recent developments indicate changes in the telecommunication industry that make it necessary for the PSC to take steps toward implementing intraLATA dialing parity in order to ensure fair and effective competition in the public interest:

> [T]he Commission is persuaded that Ameritech's Customers First Plan significantly alters the nature of competition and, therefore, signals the need for change. Although the Commission recognizes that this plan will undergo substantial changes, it is nevertheless probable, given the rapid developments in the telecommunications industry and a more flexible regulatory environment, that Ameritech will ultimately obtain relief from its interLATA restrictions. If not under the Customers First Plan, then Ameritech may obtain relief under some other form or plan. If Michigan Bell is in a position to offer interLATA toll service, but the IXCs cannot offer intraLATA dialing parity, the level playing field will cease to exist.
>
> * * *
>
> The Commission is also aware of more recent developments that may accelerate and intensify the debate about eliminating the interLATA restrictions. For example, on November 23, 1993, Congressman John D. Dingell introduced in the United States House of Representatives a bill that would give the Bell regional holding companies

relief from some of the antitrust consent decree's line-of-business restrictions, thus allowing them into the interLATA toll market. Additionally, in a December 7, 1993 news release, Ameritech announced that it had requested the United States Department of Justice to approve waivers of the interLATA restriction so that it can offer long distance service under a trial of its Customers First Plan in Illinois, beginning in early 1995. That press release also indicates that other states could be added to the trial over time. It has also recently been reported in the media that MCI plans to build local fiber optic networks in the nation's 20 largest cities for the purpose of entering the local exchange market. These developments at the national level reflect a rapidly changing telecommunications environment.

On the intrastate level, Act 179 envisions a telecommunications market place that minimizes or eliminates barriers to entry. (MCL 484.2103 [MSA 22.1469(103)].) While this case deals only with entry into the intraLATA toll market, the Commission also envisions, and Act 179 permits, entry into the local exchange market, either driven by market forces or as proposed in Ameritech's Customers First Plan. Thus, the Commission is of the view that the standard for permitting entry into either the intraLATA toll market or the local exchange market may have to be consistently applied in both areas. For the Commission to refuse to permit intraLATA dialing parity, or to permit intraLATA dialing parity contingent upon action by another agency or court, could result in the Commission having to place similar restrictions on entry into the local exchange market. The Commission believes that such artificial constraints would stifle the competition that Act 179 envisions and permits. With this in mind, the Commission must continue to balance the competing interests in making the transition to a fully competitive intrastate telecommunications market. As only one part of that transition, it is important that the Commission take the necessary steps to

implement intraLATA dialing parity, so that the participants can continue to compete on a level playing field.

Accordingly, the Commission finds that intraLATA dialing parity is necessary for effective competition and, therefore, it is in the public interest.

The PSC majority went on to opine that while immediate implementation will not be required, implementation should not be delayed beyond January 1, 1996, even if federal policy makers have not removed the current interLATA restrictions on Michigan Bell and GTE by that time:

> Further, the Commission finds that intraLATA dialing parity should be implemented when Michigan Bell and GTE are authorized and ready to provide interLATA toll service, but no later than January 1, 1996. The Commission is of the view that this decision strikes an appropriate balance between MCI's and AT&T's position that intraLATA dialing parity should be immediately implemented, and Michigan Bell's, GTE's, and MECA's position that the Commission should continue to defer implementation to a later date. If, as appears likely, interLATA relief is obtained in the near future, the benefits of competition can also be introduced into several markets in the near future. However, if federal policy-makers continue to impose restrictions against participation in one market on the Bell and GTE operating companies, continuing to postpone competitive entry into all other markets can no longer be justified. Given the clear competitive mandates of Act 179 and increasing pressure for competitive entry into markets previously served only on a monopolistic basis, intraLATA dialing parity can no longer be delayed.[9]

---

[9] The Customers First Plan applied only to Michigan Bell and the other regional Bell operating companies. If GTE is to provide interLATA toll service, it must take the necessary steps to obtain relief from that restriction.

Accordingly, the PSC ordered implementation of intraLATA dialing parity in Michigan "when Michigan Bell Telephone Company and GTE North Incorporated are authorized and able to provide interLATA toll service, but no later than January 1, 1996." The PSC also established a task force to study the various issues involved in implementing the PSC's decision.

One commissioner dissented to the majority's imposition of a January 1, 1996, deadline for implementing intraLATA dialing parity, but concurred with the remainder of the majority's decision.

Michigan Bell and GTE petitioned for rehearing and reconsideration of the PSC's February 24, 1994, order, but their petitions were denied by the PSC in an opinion and order issued on July 19, 1994. The PSC majority responded to the objections to its January 1, 1996, implementation deadline and its overall failure to make implementation conditional upon the granting of interLATA relief by explaining that changes in the telecommunication environment have prompted the PSC to loosen the connection between intraLATA dialing parity and interLATA relief, and that the public interest in effective competition renders continuation of the current dialing arrangements adverse to the public interest:

> The February 23, 1993 order deferred implementation of dialing parity and noted that Michigan Bell and GTE may be at a significant disadvantage because they are precluded from participating in the interLATA market, but the Commission did not establish an "ironclad link" between intraLATA dialing parity and interLATA relief. Rather, the Commission made a connection between intraLATA dialing parity and interLATA relief at that time for public policy reasons. However, the facts upon which those reasons were based have changed.

In the February 24, 1994 order, the Commission noted that Ameritech's Customers First Plan significantly alters the nature of competition and, consequently, signals the need for change. The Commission was persuaded that it is probable, given the rapid development of the telecommunications industry and a more flexible regulatory environment, that Ameritech will ultimately obtain relief from its interLATA restrictions either under the Customers First Plan or some other form or plan. As a result, the Commission noted that if Michigan Bell is in a position to offer interLATA toll service, but the IXCS cannot offer intraLATA dialing parity, the nature of competition will change significantly. Those considerations, as well as recent developments at the federal level, made it clear that the time has come for intraLATA dialing parity. As a matter of sound public policy, the Commission altered its finding regarding the implementation of intraLATA dialing parity to reflect major developments in the telecommunications environment.

Therefore, contrary to Michigan Bell's and GTE's contention, whether Ameritech obtains interLATA relief by January 1, 1996 was not the controlling factor in determining that intraLATA dialing parity should be implemented. The Commission specifically stated that if federal policymakers continue to impose restrictions against participation in one market on the Bell and GTE operating companies, continuing to postpone competitive entry into all other markets can no longer be justified. Therefore, the Commission decided to establish a specific implementation date based on the policy of Act 179 favoring competition. In doing so, the Commission concluded that intraLATA dialing parity is necessary for effective competition and, consequently, it is in the public interest. Implicit in that finding is the conclusion that the current manner in which intraLATA toll service is provided does not promote effective competition and, therefore, it is adverse to the public interest to maintain the status quo.

The PSC majority also rejected arguments that requiring implementation of intraLATA dialing parity in Michigan before federal interLATA relief will have catastrophic economic consequences for GTE and Michigan Bell:

> The Commission is not persuaded that implementation of intraLATA dialing parity will result in catastrophic consequences to Michigan Bell and GTE. Although the Commission recognized, in the February 23, 1993 order, that Michigan Bell and GTE may experience a significant loss in toll revenue if intraLATA dialing parity is implemented, the Commission does not believe that either company will lose 100% of its toll business, that the introduction of new services will come to a dead end, or that the state's telecommunications infrastructure will fall apart. The evidence demonstrated that those claims were based on worst case scenarios. In fact, GTE's witness, Jeffrey C. Kissell, acknowledged that it is unreasonable to assume that, in a competitive market, Michigan Bell and GTE will lose 100% of their WATS and 800 service if intraLATA dialing parity is implemented. (5 Tr. 923.) Furthermore, the Commission notes that Michigan Bell, in particular, has previously made exaggerated claims regarding the potential loss of business. The Staff's witness, William Celio, confirmed the fact that, for years, Michigan Bell has been predicting dire consequences if the Commission takes a particular action. However, the very opposite has occurred. Mr. Celio stated:
> [S]ince 1984 or thereabouts, we've been listening to Mr. Miller testify how the whole world will end, and Michigan Bell will exit from every meaningful market if the Commission does something. And [in] many cases, the Commission did that something, and . . . the only thing we've done with Michigan Bell is reduce rates and give refunds, because they were making excessive profits. So I have not seen a negative impact [from] Commission decisions. (6 Tr. 1360.)

A more realistic view of what will happen is that Michigan Bell and GTE will have to compete for dial 1 intraLATA toll traffic, if they wish to remain in that market. The Commission agrees with the Staff that this competition will result in more new services, thereby contributing to the telecommunications infrastructure and the state's economy. Additionally, although the Commission established an implementation date, it did not order that intraLATA dialing parity be immediately implemented in all end offices within the state on January 1, 1996. One of the issues to be addressed by the task force is the development of a deployment schedule. Thus, not only are Michigan Bell's and GTE's fears exaggerated, they are also premature.

The PSC majority also rejected the argument that the necessary technology for intraLATA dialing parity cannot be deployed by January 1, 1996, adding that unless intraLATA dialing parity is required by a date certain, Michigan Bell and GTE "will simply not pursue that technology." Additionally, the PSC rejected arguments that it lacks authority to order implementation of intraLATA dialing parity or that Michigan Bell and GTE were deprived of adequate notice that the PSC might consider doing so following the proceedings on remand in this case. The dissenting commissioner again dissented with regard to the January 1, 1996, deadline established by the majority.[2]

## II

On appeal, appellants begin by arguing that the PSC lacks statutory authority to implement intraLATA dialing parity. We disagree. We note that the

---

[2] Appellees have brought a number of subsequent events to our attention in supplemental briefing after oral argument but we are unpersuaded that there has been any waiver, forfeiture, or abandonment of the appellants' positions in these appeals.

PSC is a creature of statute, without common-law powers, having only the authority conferred by clear and unmistakable language in specific statutory enactments. *Union Carbide Corp v Public Service Comm*, 431 Mich 135, 151; 428 NW2d 322 (1988); *Midland Cogeneration Venture Limited Partnership v Public Service Comm*, 199 Mich App 286, 295-296; 501 NW2d 573 (1993). We also note that § 201(2) of Act 179, MCL 484.2201(2); MSA 22.1469(201)(2), itself provides that the PSC's authority in administering the act "shall be limited to the powers and duties prescribed by this act." However, we believe the PSC correctly relied upon § 205(2) of Act 179, MCL 484.2205(2); MSA 22.1469(205)(2), as sufficiently specific express statutory authority for the PSC to implement intra-LATA dialing parity.

Section 205(2) expressly authorizes the PSC to require changes in how telecommunication services are provided based upon a determination that the quality, general availability, or conditions for a regulated service are adverse to the public interest. Here, appellants do not deny that intra-LATA toll service and the access necessary to provide such toll service are telecommunication services regulated under §§ 310-312 of the act. Although dialing patterns or arrangements are not specifically identified as part of the toll and access services regulated under §§ 310-312, there can be little dispute that dialing arrangements are at least "conditions for" such regulated services, if not actually part of the regulated services themselves, nor can it be denied that dialing arrangements affect how toll and access services are provided. Thus, upon the PSC's determination that the current dialing arrangements for intraLATA long distance service are adverse to the public interest, the language of § 205(2) is sufficient to authorize

the PSC to require changes in the dialing arrangements, including implementation of 1+ dialing parity.

While it is true that § 205(2) does not specifically mention intraLATA 1+ dialing parity or dialing arrangements in general, we find the statute's reference to "conditions for regulated service" sufficiently specific. We do not believe the Legislature was obliged to attempt to specifically enumerate all of the conditions for regulated services possibly covered by the statute. In this regard, we find Michigan Bell's reliance upon § 401(2) of the act misplaced. By providing that the PSC "shall not have the authority over a telecommunication service not specifically provided for in this act," § 401(2) prohibits the PSC from regulating certain kinds of telecommunication services not specifically provided for in the act. See *In re Procedure & Format for Filing Tariffs Under the Michigan Telecommunications Act,* 210 Mich App 533, 536, 542; 534 NW2d 194 (1995). As we have already noted, intraLATA dialing parity may be viewed as a condition for regulated toll and access services specifically provided for in the act.

The mere fact that intraLATA 1+ dialing parity is specifically mentioned in § 202(f)(x) does not necessarily imply that intraLATA dialing parity is not within the scope of the PSC's authority under § 205(2) as well. See, e.g., *Ass'n of Businesses Advocating Tariff Equity v Public Service Comm,* 205 Mich App 383, 389; 522 NW2d 140 (1994) (statute specifically providing for PSC approval of energy conservation programs for residential ratepayers does not limit PSC's authority to approve utility's energy conservation program costs in rates). With regard to Act 179 in particular, this Court has already recognized that a statutory provision requiring the PSC to investigate the effect of a cer-

tain kind of regulatory action is not necessarily inconsistent with the PSC already having discretion to take such action by virtue of its regulatory authority granted elsewhere in the act. *In re PSC Determination, No 1,* 204 Mich App 344; 346-348; 514 NW2d 535 (1994). Moreover, the fact that the House of Representatives initially adopted both the Power/Bandstra amendment mandating implementation of intraLATA dialing parity and the amendment adding the reporting requirement of § 202(f)(x) supports the conclusion that the latter provision is not intended to be a limitation on the PSC's authority to implement dialing parity. We agree with the PSC that the fact that the Power/ Bandstra amendment was ultimately deleted from the final version of the act simply indicates that the Legislature did not intend to *require* the PSC to implement intraLATA dialing parity, not that the Legislature intended to reserve to itself sole authority to determine whether intraLATA dialing parity should be implemented.

III

Appellants also argue that even if the PSC's authority under § 205(2) includes the authority to implement intraLATA dialing parity, the PSC failed to follow the proper procedures for doing so in this case. Specifically, appellants object that the PSC never made a specific finding that the current intraLATA dialing arrangements are adverse to the public interest, but at most, merely found that implementing 1+ dialing parity would be in the public interest. We reject this argument.

We find appellants' objection to be more concerned with the form rather than the substance of the PSC's decision. While it is arguably true that the PSC could find that one dialing arrangement is

in the public interest without necessarily concluding that another is adverse to the public interest, this is obviously not the substance of the finding made by the PSC in this case. As appellees note, the PSC not only found that implementation of 1+ dialing parity is in the public interest, but also that it was "necessary" to serve the public interest in the type of effective competition envisioned by Act 179. Moreover, the PSC specifically clarified in its July 19, 1994, opinion and order denying rehearing that the intended substance of its finding was that continuation of the current dialing arrangements, i.e., "the status quo," would in fact be adverse to the public interest. We do not believe that it is necessary to remand the case to the PSC for further findings of fact in this regard.

We also find no merit to GTE's objections that it was improper for the PSC to exercise its authority under § 205(2) in this case because the statute was not properly pleaded in MCI's complaint, because MCI's complaint was ultimately dismissed, or because a "quasi-judicial" complaint case is not the proper vehicle for the type of "quasi-legislative" inquiry into the public interest contemplated by § 205(2). We are satisfied from our review of MCI's complaint that the issue whether the current intraLATA dialing arrangements were adverse to the public interest for purposes of § 205(2) was properly raised, particularly in ¶ ¶ 25 and 63 of the complaint and, although the PSC ultimately dismissed MCI's complaint, it specifically retained jurisdiction to address the § 205(2) issue. We find nothing improper with the PSC exercising its authority under § 205(2) in the context of a complaint case. Section 205(1) specifically refers to the PSC's authority to "investigate and resolve complaints." Moreover, it is not impermissible for the PSC to establish broad rules and policies in the

context of a contested case proceeding. See *Midland Cogeneration, supra* at 310.

IV

We reject Michigan Bell's argument that the "adverse to the public interest" criterion of § 205(2), as interpreted by the PSC, is so vague and standardless as to constitute an unconstitutional delegation of legislative power, or that the criterion has been arbitrarily applied by the PSC in this case. Ordinarily, a four-factor test is used to determine whether adequate standards have been adopted for the delegation of statutory power. First, the act in question must be read as a whole, and the provision in question must be construed with reference to the entire act. Next, the standard should be as reasonably precise as the subject matter requires or permits. Third, if possible, the statute must be construed as being valid, conferring administrative and discretionary authority, not legislative and arbitrary authority. Last, the statute must satisfy due process requirements. See, e.g., *Attorney General v Public Service Comm,* 161 Mich App 506, 510; 411 NW2d 469 (1987).

Here, the PSC's interpretation of the "public interest" standard of § 205(2) seems consistent with a reasonable interpretation of Act 179 as a whole, inasmuch as the PSC construed the "public interest" standard according to the overall goal of Act 179 to promote effective competition in telecommunication services. In this regard, the PSC has properly read the statute in context to give content to the "public interest" standard. In finding that implementation of intraLATA dialing parity is in the public interest, the PSC did not apply a wholly arbitrary notion of the "public interest," but relied upon its determination of what action

would best serve the public interest in a competitive telecommunication market. While appellants may disagree with the PSC's determination that implementing intraLATA dialing parity helps to foster a competitive marketplace, the fact that appellants are able to marshal facts and arguments to support their position in this regard serves to indicate that the public interest in competition is something that can be objectively determined, rather than a wholly amorphous and standardless concept.

Turning to the second factor of the test, appellees correctly note that broad statutory standards based upon public interest, convenience, or necessity are frequently used in the regulation of public utilities. This is due to the wide range of discretion ordinarily accorded to administrative regulators in the public utilities context. See, e.g., *In re Provider Class Plan*, 203 Mich App 707, 729; 514 NW2d 471 (1994). In this regard, requirements of "just and reasonable" rates, or conditions in the "public interest" are as reasonably precise as the subject matter permits. See *Attorney General, supra* at 510-511. Where, as here, such standards are applied in accordance with the requirements and purposes of the legislation in which they appear, such standards are not unconstitutional because of vagueness or delegation of legislative power. *Id.; National Broadcasting Co v United States*, 319 US 190; 63 S Ct 997; 87 L Ed 1344 (1943).

Regarding the third factor of the test, the PSC appears to have properly construed the "public interest" standard as permitting only the exercise of its discretionary power to administer the act in accordance with its overall requirements and purposes, rather than a wholesale grant of legislative or arbitrary power. We find it unnecessary to add a limiting construction exempting 1+ dialing ar-

rangements from the scope of the statute as Michigan Bell suggests. Indeed, creating such an exception would appear to do little in the way of adding clarity or specificity to the "public interest" standard.

As for the fourth and final factor of the test, the requirements of due process appear to be fully satisfied here where all interested parties were afforded ample opportunity to litigate the issues in a contested case hearing held in accordance with the requirements of § 205. *Attorney General, supra.*

We are unpersuaded by Michigan Bell's argument that the PSC's May 21, 1993, remand order and subsequent notice of hearing affirmatively misled Michigan Bell into believing that the PSC would be considering only implementation of intraLATA dialing parity "if and when" the interLATA relief requested by Michigan Bell's parent company is granted by federal authorities.

As noted by the PSC in its July 19, 1994, order denying rehearing, the PSC plainly indicated in its May 21, 1993, remand order and subsequent notice of hearing that the purpose of allowing further development of the record was to allow the PSC to "reevaluate" its previous determinations. Although the PSC refused to reinstate MCI's complaint, it plainly indicated that its previous determination that implementation of intraLATA dialing parity pursuant to § 205(2) of the act should be deferred until a later time, due in part to the interLATA restrictions imposed upon Michigan Bell and GTE by federal authorities, was one of the matters that the PSC would ultimately "reevaluate" after further development of the record. In this regard, the PSC's reference to implementation of intraLATA dialing parity "if and when" federal interLATA relief is granted appears to be more of

an indication of the issues to be reevaluated rather than a self-imposed restriction on the PSC's authority to fully reconsider the matter. We find this to be especially clear when one considers the fact that the PSC indicated in both its May 21, 1993, remand order and subsequent notice of hearing that it may establish an overall policy affecting both GTE and Michigan Bell, despite the fact that only Michigan Bell was to receive interLATA relief pursuant to the Ameritech proposal to be considered on remand:

> An analysis of this information is appropriate so that the Commission may reevaluate its determinations based on a full and complete record. Finally, although GTE will not be affected by Ameritech's petition, the Commission agrees with the Staff that this proceeding should be used to establish an overall policy that would also apply to GTE.

Obviously, if the PSC was considering establishing a policy for implementing intraLATA dialing parity that would be applicable to GTE regardless of whether GTE had actually obtained interLATA relief, the PSC was not considering only implementing intraLATA dialing parity in conjunction with federal interLATA relief. Moreover, the fact that Michigan Bell repeatedly argued throughout the proceedings after remand decision that implementation of intraLATA dialing parity should be tied to and conditional upon interLATA relief seems to us to suggest that Michigan Bell was aware that the issue of unconditional implementation of intraLATA dialing parity was not wholly beyond the PSC's consideration at that point.

V

Finally, we do not believe that appellants have

met their burden of establishing by clear and satisfactory evidence that the PSC's decision is arbitrary, capricious, an abuse of discretion, or unsupported by the requisite competent, material, and substantial evidence on the whole record. *Michigan Intra-State Motor Tariff Bureau, Inc v Public Service Comm,* 200 Mich App 381, 387-388; 504 NW2d 677 (1993).

We are satisfied from our review of the record that the requisite evidentiary support exists for the PSC's decision in this case. Appellants do not address the evidentiary record in much detail but instead largely rely upon the theory that since the PSC initially declined to implement intraLATA dialing parity in 1993, substantial evidence presented at the initial phase of the case supported deferral of intraLATA dialing parity, and to the extent that the evidence presented on remand did not substantially contradict the evidence presented in the initial phase supporting deferral, there was not substantial evidence to support any change in the PSC's initial decision in support of deferral.

We find appellants' theory unsupported by the true nature of the PSC's decisions in this case. In its initial opinion and order issued on February 23, 1993, the PSC did not really decide the issue whether implementing intraLATA dialing parity, either with or without corresponding federal interLATA relief, would be in the public interest or adverse to it for purposes of § 205(2). Rather, the PSC merely deferred consideration of that issue until a later time, because of the complexity of the issues involved. While the PSC did reject MCI's arguments that the lack of intraLATA dialing parity was a deprivation of equal access and therefore violative of § 305 and § 312(4) of Act 179, it specifically declined to determine whether implementation of intraLATA dialing parity, either with or

without corresponding interLATA relief, should be granted on the basis of the PSC's discretionary authority under § 205(2) of the act. It is true that the PSC noted the existing federal interLATA restrictions upon Michigan Bell and GTE in its initial decision to defer deciding the § 205(2) issue, this is not the same thing as an affirmative determination that deferring implementation of intraLATA dialing parity until federal interLATA relief is granted is in the public interest or that changing the current dialing arrangements without corresponding federal interLATA relief would be adverse to the public interest.

Appellants overlook the fact that it was adjudication of the § 205(2) issues, not the implementation of intraLATA parity itself, that the PSC indicated that it was deferring in its February 23, 1993, decision. However, deferral of the § 205(2) issues necessarily had the practical effect of deferring any implementation of intraLATA dialing parity as well. In this regard, the only "reversal" of the PSC's initial deferral decision was in its May 1993 order reopening the record to undertake further consideration of the implementation issue on the basis of the record developed in the instant case, as opposed to some other, future proceeding. When the PSC later decided, in its February 24, 1994, opinion and order, that implementation of intraLATA dialing parity should not be delayed further, even if federal interLATA relief is not granted in the near future, because continuation of the status quo would be adverse to the public interest, the PSC was simply reaching the issue that it had previously deferred, not reversing any prior determination of the issue.

Obviously, the PSC was well aware that federal interLATA relief might not be granted by the January 1, 1996, deadline, and that Michigan Bell and

GTE were still likely to be significantly disadvantaged if intraLATA dialing parity is implemented without corresponding federal interLATA relief. The PSC never really previously determined that this was sufficient justification to defer implementation of intraLATA dialing parity indefinitely, but only that this justified "further consideration" of the issue. Thus, it makes little sense for GTE to complain that there is no evidence in the record establishing that it will be granted federal interLATA relief by January 1, 1996, or that it will not be significantly disadvantaged in its ability to compete with interexchange carriers in the intraLATA long distance market in the absence of such interLATA relief. The PSC did not really make any findings to the contrary. Rather, the PSC majority essentially concluded that the potential disadvantages to Michigan Bell and GTE in the absence of corresponding federal interLATA relief are, under the circumstances, insufficient justification for further delaying implementation of intraLATA dialing parity in Michigan.

We do not find the PSC's decision to be arbitrary, capricious, or an abuse of discretion. Essentially, the PSC was required to make a judgment call based upon the various pros and cons of requiring implementation of intraLATA dialing parity by a date certain, regardless of whether federal interLATA relief is granted, or instead deferring implementation indefinitely to await further action by federal policy makers concerning the issue of interLATA relief. In its February 24 and July 19, 1994, opinions, the PSC majority identified cogent reasons for preferring the former situation to the latter. For example, the PSC reasoned that adopting a policy of maintaining the status quo until further action is taken by some federal agency or court would create an "artificial constraint" upon

intraLATA toll competition, even as the various telecommunication markets and the parties' respective positions in them continue to rapidly change, inhibiting the PSC's ability to respond to those changes. Michigan Bell and GTE do not really dispute the fact that their exclusive use of 1+ dialing arrangements gives them a competitive edge over interexchange carriers such as MCI in the intraLATA toll market, thereby impairing effective competition to that extent, but simply argue that the advantage is justified to offset the advantages that the interexchange carriers have by virtue of their ability to service the interLATA toll market. Nor does it appear to be disputed that the various telecommunication markets, and the participants in them, are rapidly changing. Evidence was presented that MCI and others will soon begin to compete in the local exchange market, for example.

On the other hand, the PSC majority found that the effect of implementing intraLATA dialing parity without corresponding federal interLATA relief, while substantial, would not be as devastating as appellants had claimed. The PSC noted changes in the availability and feasibility of two-PIC technology that would allow GTE and Michigan Bell to avoid much of the technological "insuperable disadvantage" noted by the federal district court in the Bell divestiture case in the event that customers are required to choose the same intraLATA and interLATA toll carrier.

This Court will not displace the PSC's choice between two reasonable competing alternatives, and will accord a special deference to the PSC's determination where, as here, experimental legislation is involved. *In re Quality of Service Standards for Regulated Telecommunication Services,* 204 Mich App 607, 612; 516 NW2d 142 (1994). The

fact that the utility commissions of several other states have implemented intraLATA 1+ dialing parity despite the lack of corresponding interLATA relief, while many other states still have not, seems to establish at least that there is room for reasonable minds to differ with regard to this issue. Thus, while there may be reasonable grounds for disagreement with the PSC's decision, we are not persuaded that the PSC's decision is arbitrary, capricious, or an abuse of discretion.

Affirmed.